Commonwealth *v.* Green, Appellant.

Argued. December 1, 1947. Before MAXEY, C. J., LINN, STERN, PATTERSON and JONES, JJ.

*Raymond Pace Alexander*, for appellant.

*Ephraim Lipschutz*, Assistant District Attorney, with him *John H. Maurer*, District Attorney, for appellee.

OPINION BY MR. JUSTICE LINN, January 5, 1948:

Appellant, convicted of murder of the first degree and sentenced to life imprisonment makes two complaints: 1. "That the verdict was against the credible evidence," and 2, that he should have had a new trial to allow the introduction of after-discovered evidence.

1. The first complaint, more specifically stated, is that defendant was not sufficiently identified as the killer. Blount, the victim, was watchman at the Standard Theatre located on the south side of South Street (No. 1126) between 11th and 12th Streets. At about

2:30 A. M. on November 4, 1946, he came to the theatre with a companion, Caldwell, and, on entering, noticed that there had been some interference with the property; a "bar was broken." He pointed out and instructed Caldwell to go to a hot dog stand at 12th and South Streets and stay there "until I investigate"; witnesses testified this stand was 275 feet away from the theatre. While Caldwell complied with this request, Blount went into the theatre. There was evidence of attempted robbery. In due time, Blount came out of the theatre with a man whom he had arrested. He took him westward across South Street to the northwest corner of 12th and South Streets to a police call-box. While Blount was calling the patrol wagon, the prisoner shot him twice, and ran westward on South Street. Blount died almost immediately. According to the witness O'Mahoney, the hot dog stand where Caldwell stood was about 26 feet from the police call-box. Caldwell stated that he watched Blount bring his prisoner from the theatre to the call-box and saw what occurred there. The place was lighted by a light a short distance from the call-box and by a street light nearby. Caldwell identified the defendant as the killer. At first he said, "He [defendant] looks pretty much like the fellow that came out" [of the theatre] "same height and same complexion"; "it looks like him," he had no hat, "gummy looking hair." Later, he said, "I got a fairly good look at him in the excitement when the gun went off and shot him," "the same nose and all." "I could not make any mistake." Another witness on identity was Hargett. This witness, while walking westward on South Street, watched Blount take his prisoner to the call-box; he saw the shooting and saw defendant run away; he had seen him before and "got a good look at him"; he said there was plenty of light to see and recognize him. Another witness, Suggs, testified that he had seen defendant before and was at a point about 25 feet away and saw defendant shoot Blount. He testified

that after the shooting during the night the defendant came to his room in the neighborhood and asked him to allow him to spend the night there, a fact which defendant denied. A witness, Woolford, called by the defendant testified that he was "three quarters of a block away" when the shooting occurred and that it was not done by defendant; his evidence is, however, not free from ambiguity. Marie Stokes testified that she saw the shooting and that it was not done by defendant; she said "The man I saw was smaller, and he had a small mustache; he is much darker than Green. He had on a blue sailor jacket."

Defendant denied all connection with the crime. He is described in the brief filed on his behalf as "a young Negro of medium brown complexion." He stated that he went into the theatre at about five thirty on November 3rd and remained there until eleven thirty "and got home exactly at twelve o'clock and turned in to bed," where he remained until morning. He roomed at 1029 South Street, about a block east of the theatre. He was arrested there on November 19th. Asked whether he worked he replied, "I have no steady job." During the war he was in the navy. Occasionally, he obtained employment on the "waterfront."

Obviously it was the duty of the jury to decide whether defendant did the shooting or whether someone else did it. In the argument made in this Court on behalf of defendant, his counsel suggests that the witness Suggs was unworthy of belief because of sex perversion. But the effect of that on his veracity was a matter for consideration by the jury in the course of its deliberation on the whole case. Counsel who presented the case in this Court was not present at the trial in the court below and counsel who tried the case below was not in the case in this Court. Trial counsel perhaps could more accurately sense the effect of the presentation of the evidence from the witness stand than one not present. We therefore

quote a paragraph from his brief filed below in support of his motion for a new trial. "Before examining the testimony, we wish to take this opportunity to state for the record that the charge of the trial court was comprehensive, lucid, substantively correct legally and, above all, a remarkably intelligent exposition of a jury's function, 'reasonable doubt' and 'presumption of innocence.' We are not content to employ the dubious and negative criticism of 'The charge was unattended by substantive error'; rather, we positively assert that it was a masterpiece of judicial instruction."

We have referred to evidence which, if believed, would justify the verdict. That is the limit of our inquiry in such cases. The Act of February 15, 1870, P. L. 15, section 2, 19 PS 1187, provides: "In all cases of murder in the first degree, removed into the supreme court under the provisions of the first section of this act, or now pending in the said court, it shall be the duty of the judges thereof to review both the law and the evidence, and to determine whether the ingredients necessary to constitute murder in the first degree shall have been proved to exist; and if not so proved, then to reverse the judgment and send the same back for a new trial, or to enter such judgment as the laws of this commonwealth require."

The statute has been construed to mean that "If there is competent evidence to support the verdict we cannot usurp the function of the jury and reverse merely because it might be contended they should not have believed the witnesses produced on behalf of the Commonwealth." See *Com. v. Watkins*, 298 Pa. 165 and cases cited page 168, 148 A. 65. Further on in that opinion it is said: "The legislature never intended to impose upon this court the duty of weighing the evidence and passing upon the credibility of witnesses in first degree murder cases and we have never so construed it." See also *Com. v. Diaco*, 268 Pa. 305, 111 A. 879; *Com. v. Priest*, 272 Pa. 549, 116

A. 403; *Com. v. Troup,* 302 Pa. 246, 153 A. 337; *Com. v. Blanchard,* 345 Pa. 289, 27 A. 2d 48. There is no doubt that the ingredients necessary to constitute murder in the first degree were proved to exist. Not only was the killer arrested during the perpetration of the robbery, but he deliberately aimed at and shot the victim in a vital part of his body.

We must therefore reject the contention that the jury should have viewed the evidence in accord with the suggestion now made by appellant's counsel.

2. The second contention that appellant should have been given a new trial to permit him to put in after-discovered evidence must be rejected because he has not made out a case within the rule. The well-established rule was stated by MOSCHZISKER, C. J., in *Com. v. Elliott,* 292 Pa. 16, at p. 24, 140 A. 537. "After-discovered evidence, offered only to impeach the credibility of witnesses who testified at the trial, 'furnishes no sufficient reason for granting a new trial': Com. v. Carter, 272 Pa. 551, 555. Speaking generally, the grant of a new trial is a matter of discretion with the trial court, and we will not, in a murder case, reverse the action of such a tribunal in refusing that relief unless it clearly appears that harmful error occurred at the trial, or in cases of manifest abuse of discretion (Com. v. Patterson, 272 Pa. 522, 524), which, after considering all the assignments on the subject, we do not find to be present here. The averments of the affidavit offered in this case, if believed, would show only that, while Treadway, Rodgers and Moss had known each other for some weeks, the association of Elliott with them began the evening the crime was committed; further, that Treadway indicated to affiant jealousy of Peirce and apprehension that the latter might pay attentions to the Rodgers woman, with whom he, Treadway, was living. The first would be no more than cumulative evidence to reinforce Elliott's own testimony, and, considering all the proofs on this record, the second

would be of little or no importance. There is no good reason to believe that either of the facts alleged in this affidavit, had they been in evidence, would have affected the conclusions of the jury as to what actually took place in Peirce's apartment at the time of the homicide."

Is his opinion refusing a new trial, this matter was so thoroughly considered by Judge ALESSANDRONI that we quote with approval his concise statement on the subject. "This affidavit is an attack upon the credibility of a prosecuting witness. It contains information that was known to the defendant and to the defendant's counsel at the time of the trial. Counsel for the defendant urges that the testimony of the prosecuting witnesses was produced as a result of the malicious desire for revenge on the part of a homosexual. Even the defendant's testimony establishes that his conduct with Suggs was limited to two occasions, on the second of which he rebuffed the immoral advance of Suggs and thereafter had nothing to do with him. It does not appear, even from the defendant's evidence, that Suggs was so aggrieved by defendant's action as to bestir in him a malice and vindictiveness so all-consuming as to be appeaseable only by sending Green to his doom. On the contrary, he is alleged to have consorted with Ernest Fleming, not only before this killing but thereafter, for whom he proclaimed his very deep affection.

"We do not believe that the alleged 'after-discovered testimony' raised a substantial doubt of the guilt of the defendant. Commonwealth v. Harris, 351 Pa. 325, 332. It is well established that after-discovered evidence offered only to impeach the credibility of witnesses who testified at the trial does not constitute sufficient ground for granting a new trial. Commonwealth v. Becker, 326 Pa. 119; Commonwealth v. Elliott, 292 Pa. 16; Commonwealth v. Carter, 272 Pa. 551. Moreover, it does not appear that there was any suppression of evidence by the Commonwealth or that the evidence which the defendant

now seeks to introduce was such as could not have been obtained at the trial by the use of reasonable diligence. Furthermore, it is simply corroborative and cumulative and had all this testimony been in evidence at the trial there is no good reason to believe that it would have resulted in a different verdict. Commonwealth v. Kerns, 124 Pa. Superior Ct. 61, 64.

"It is incumbent upon the party who moves for a new trial on the ground of newly discovered evidence to satisfy the court that the newly discovered evidence is such as could not with reasonable diligence have been discovered and produced at the trial; that it is not merely cumulative and that it is such as to render a different result probable on the retrial of the case. Commonwealth v. Russella et al., 117 Pa. Superior Ct. 359, 366; Commonwealth v. Brady, 76 Pa. Superior Ct. 488.

"Even if we assumed that this affidavit complies with the requirements of after-discovered evidence, and also assumed that it goes to the merits, we are not convinced that the legal effect of the proposed evidence and the legitimate effect thereof would require a different verdict if the combined evidence was presented to another jury. Commonwealth v. Greenfield, 103 Pa. Superior Ct. 489, 495."

We have considered the argument presented in appellant's supplemental brief. With respect to the evidence of James Fleming, it is sufficient to say that while he testified that, while "going around the corner by the hot-dog stand" he saw Blount coming out of the theatre leading a man who was not the defendant Green. The witness was not at 13th and South Streets when the shooting occurred. He testified that he and a girl "walked up the street to Pine Street; I was taking her home. I came on back; the shooting had already taken place." The jury, of course, had the duty of considering this evidence.

Judgment affirmed.