Commonwealth *v.* Green, Appellant.

516

Argued November 19, 1956.   Before STERN, C. J., JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Rose Kotzin*, with her *Abraham E. Freedman* and *Freedman, Landy & Lorry*, for appellant.

*Thomas M. Reed*, Assistant District Attorney, for appellee.

OPINION PER CURIAM, January 17, 1957:

This is an appeal from the refusal of the court below, sitting en banc, to grant defendant a new trial under the provisions of the Act of April 22, 1903, P. L. 245, 19 PS §861, et seq.

Appellant, William S. Green, was regularly indicted, tried, and convicted of murder of the first degree in 1947, the jury fixed the penalty at life imprisonment, and the sentence on the verdict was affirmed: *Commonwealth v. Green*, 358 Pa. 192, 56 A. 2d 95.   In 1953 a petition for allowance of a new trial was filed in this Court on the grounds of after-discovered evidence under the Act of April 22, 1903, supra, which petition was denied Per Curiam.   On February 10, 1956 appellant filed another petition in this Court under the Act of

April 22, 1903, alleging further after-discovered evidence. This petition was granted[1] and we issued an order to the Court of Oyer and Terminer of Philadelphia County authorizing it to grant a rule for new trial nunc pro tunc. The rule was allowed, but, after argument thereon, was discharged and new trial refused. This appeal followed. The District Attorney, representing the Commonwealth, joined in the prayer of appellant's petition in the court below for a new trial and also joins with appellant here.

Section 2 of the Act of 1903, 19 PS §862, provides: "Upon the termination of the hearing of . . . [the rule for a new trial], if the court of oyer and terminer shall not deem the grounds sufficient it shall thereupon discharge said rule, and the proceedings shall terminate, and the judgment and sentence theretofore entered of record shall remain unaffected.". The effect of this section is the same as though the Legislature had said in terms, "There shall be no appeal from an order discharging such a rule for new trial": *Commonwealth v. Greason,* 208 Pa. 126, 57 A. 349; *Commonwealth v. Cicere,* 286 Pa. 296, 133 A. 795; *Commonwealth v. Del Vaccio,* 303 Pa. 519, 154 A. 789. The law is clear that where a statute expressly provides that there shall be no appeal, the scope of appellate review is limited to the question of jurisdiction and the regularity of the proceeding; the merits of the controversy cannot be considered even though the interpretation given to the facts or the law by the court below may have been erroneous:

---

[1] See *Commonwealth v. Del Vaccio,* 303 Pa. 519, 154 A. 789, to the effect that where an appeal taken from a conviction for murder is affirmed, and thereafter we grant a rule on the Commonwealth for new trial under the Act of 1903, and the court of oyer and terminer, after hearing the witnesses, discharges the rule, the defendant cannot file a second petition in this Court for a rule for new trial based on further after-discovered evidence.

*Kaufman Construction Company v. Holcomb et al.,* 357 Pa. 514, 55 A. 2d 534, and the many cases cited therein. It is not argued that the proceedings in the court below were in any way irregular. Appellant contends that the court below exceeded its jurisdiction in that it assumed the role of a jury in reviewing the after-discovered evidence on the issue of credibility, but a careful reading of the court's opinion shows that it determined only that in its view, the new evidence was insufficient to justify the granting of a new trial. Appellant also contends that since the Commonwealth joined in his petition for a new trial, the court below had jurisdiction only to determine whether appellant actually possessed the after-discovered evidence he alleged in his petition to this Court. However, the Act of 1903 specifically gives the court of oyer and terminer jurisdiction to determine whether the grounds are sufficient to justify the granting of a new trial.

It is argued that appellant has been deprived of due process of law because in refusing to grant a new trial, the court below acted in an arbitrary manner. Apart from the fact that this does not go to the court's jurisdiction, it is clear that appellant was convicted and sentenced under due process of law. The court had jurisdiction, he was represented by competent counsel, and had a fair and impartial trial before an able and just judge. Consequently, the imprisonment under which he is held is lawful: *Commonwealth ex rel. Harris v. Burke,* 374 Pa. 43, 96 A. 2d 909.

The essence of appellant's petition is that he was convicted on perjured testimony of a crime for which he has served almost ten years. Under the Act of 1903, our appellate review is severely limited. There is obviously another door open to the appellant if his further restraint is unjustified in the light of subsequent

developments. He may ask the Board of Pardons to recommend that the Governor exercise his power to grant a pardon.

The appeal is dismissed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

With all due respect, I feel myself obliged to say in this case that the Majority Opinion misses the whole point in the appeal. The question before us is not whether William S. Green was convicted under due process of law. No one disputes that the defendant was accorded due process of law when he was tried for murder in 1947. What the defendant submits to this Court for consideration, and what his learned counsel so ably presented to this Court, both orally and by exhaustive brief, is that, after Green was convicted, the light of events brought into focus the astonishing fact that two of the witnesses who had contributed much of the motive power which had carried him to the penitentiary for life, had committed perjury at his trial. Thus, in this state of affairs, the path of law and logic is invaded by the foliage of irrelevancy when the Majority Opinion says: ". . . it is clear that appellant was convicted and sentenced under due process of law. The court had jurisdiction, he was represented by competent counsel, and had a fair and impartial trial before an able and just judge." Of course, the trial Court had jurisdiction; of course the appellant was represented by competent counsel; of course, he had a fair and impartial trial before an able and just judge, and, I am happy to add, one of the ablest trial judges in the country. But what the appellant brings to this Court's attention is that, with all of the Court's jurisdiction, and

with all of the competence of counsel, and with all of the fairness and impartiality of a trial before an able and just judge, the Commonwealth still convicted the wrong man! Not because of any failure of due process of law, but because of false testimony introduced against him. If that contention wears the flesh of truth and reality, no one should seriously maintain that he does not deserve a new trial.

The defendant was convicted of murder in the first degree on the testimony of three identifying witnesses: James Hargett, Alonzo Suggs, and Lonnie Caldwell. About a year ago, one of these men, James Hargett, confessed that he had given false testimony at the trial. He stated, under oath, that he not only could not identify Green as the killer but that in fact he was not even at the scene of the crime. Further, that it was Alonzo Suggs, one of the other witnesses, who, on the offer of a bribe, suborned him, Hargett, to commit the perjury. This recantation was brought to the attention of the District Attorney of Philadelphia County, who, with commendable dispatch, launched an investigation of his own. Hargett repeated to him the story of his perjurious testimony against Green, and related further that Suggs recently had been calling on him to "stick to his story," since the District Attorney was opening up the case again.*

---

* It appears that Hargett underwent various lie detector tests in this connection, the results of which seemed to confirm his statements. I agree with the Court below that the so-called lie detector machine has not reached that stage of perfection (and I doubt that it ever can) where it can reveal with eternity-defying accuracy the state of a man's heart, showing what is written there and whether or not truth guides the blood to his brain. In any event, polygraph tests are not judicially acceptable: *Commonwealth ex rel. Riccio v. Dilworth*, 179 Pa. Superior Ct. 64; *State v. Kolander*, 236 Minn. 209. However, the sworn statements made by Har-

Another person, Eugene Fleming, who had identified Green at the Magistrate's hearing as the person he saw committing the murder, but who failed to testify at the trial, also made a sworn statement in which he charged Suggs with having offered him $100 to falsely accuse Green. The District Attorney summoned Suggs for questioning and, after various interviews with him, declared that Suggs had made so many contradictory statements that it was "almost impossible to attach credibility to any one statement." It was also ascertained in the examination conducted by the District Attorney, what was not known prior to the trial, that Suggs had a long criminal record.

The District Attorney, after this series of startling disclosures, added to others which further shook his confidence in the reliability of the prosecution's evidence presented at the trial, decided to intervene. Instead of acting like the proverbial district attorney of dramatic fiction—who is portrayed as always demanding that the conviction and sentence, like the laws of the Medes and Persians, remain untouched and untouchable—the District Attorney of Philadelphia County joined with the prisoner in calling upon the Courts to take action which would lift the trapdoors which had closed over the case, so that the light of dispassionate inquiry would reveal whether or not an innocent man was languishing in prison.

This Court, upon appropriate representations being made to it under the Act of April 22, 1903, P. L. 245, authorized the Trial Court, in view of the after-discovered evidence, to reconsider the case. The lower Court held a hearing, considered the affidavits and other ma-

---

gett cannot be ignored because, by speaking under oath, he subjects himself to the criminal charge of perjury if he falsifies.

terial presented, and decided against the prisoner-appellant.

I have the highest respect and admiration for the lower Court and I do not doubt for a moment that its decision was arrived at with the conscientious desire that justice be done. Nevertheless I believe that this Court is charged with the responsibility of reviewing all that has happened in this case since our decision in *Commonwealth v. Green,* 358 Pa. 192. The Majority of this Court is of the view that we have no jurisdiction to review in a case of this kind, citing the seeming limitations in the Act of 1903. I cannot believe that the Legislature, in enacting the law of 1903, had in mind interdicting this Court from turning the pages of the record of a murder trial to ascertain if somewhere in the story, innocence did not meet with foul play at the hands of perjury. Although the Act of 1903 does indicate that the proceedings shall terminate if the Trial Court refuses a new trial, it does not declare that in the event the petitioner deems himself aggrieved he may not apply to this Court for correction of any possible error committed in the proceedings authorized by that very Act.

In supporting its view of aloofness to the appellant's request, the Majority says in its Opinion: "The law is clear that where a statute expressly provides that there shall be no appeal, the scope of appellate review is limited to the question of jurisdiction and the regularity of the proceeding; the merits of the controversy cannot be considered even though the interpretation given to the facts or the law by the court below may have been erroneous." As authority for this statement the Majority cites the case of *Kaufman Construction v. Holcomb et al.,* 357 Pa. 514, but the facts in that case are polarly distant from the ones before us here. In

the *Kaufman* case the statute under consideration specifically declared: "The award of the Board of Arbitration shall be final, and *no appeal from such award to any court shall be allowed.*"* Moreover, the subject matter in that case had to do with a claim presented to the Board of Arbitration and Claims of Pennsylvania for property damages. Here, we are not considering property or money but a man's liberty. We have before us the spectacle of a man convicted and sentenced to life imprisonment on the testimony of three men, one of whom has declared, repeated, and reiterated in various forms under oath that his testimony was false and that the testimony of another one of the witnesses was false. It cannot be possible that the Legislature ever meant to preclude this Court from correcting, if there was such, an erroneous interpretation of law or facts by a Court of original jurisdiction, nor do I believe that this Court, by its language in the *Kaufman* case, ever intended to so close the record of a murder case that it could not be opened by this Court when justice requires we do so. In fact, in the very *Kaufman* case, we quoted with approval what was said in *Twenty-First Senatorial District Nomination,* 281 Pa. 273, namely, "Where, in a statutory proceeding, the legislature fails to provide for an appeal, and because of that omission, the action of the tribunal involved is, generally speaking, considered final . . . *a certiorari to inspect the record, in the broadest sense allowed by our cases, may, nevertheless, issue . . .*"

In *Commonwealth v. Jones,* 303 Pa. 551, this Court, speaking through Mr. Chief Justice MAXEY, said: "This court has power to order a new trial when in its opinion the case requires it, for it possesses the powers of

---

* Italics throughout mine, unless otherwise indicated.

the King's Bench in criminal cases".

As recently as 1954, this Court, speaking through Mr. Chief Justice STERN, re-emphasized, in the case of *Commonwealth v. Onda*, 376 Pa. 405, 408, the above assertion: "More than two centuries ago section XIII of the Act creating the Supreme Court of this Commonwealth (Act of May 22, 1722, 1 Sm. L. 131) provided that the court should 'minister justice to all persons, and exercise the jurisdictions and powers hereby granted concerning all and singular the premises according to law, as fully and amply, to all intents and purposes whatsoever, as the Justices of the Court of King's Bench, Common Pleas, and Exchequer, at Westminster, or any of them, may or can do.' Thus the power of superintendency over inferior tribunals became vested in this court from the very time of its creation . . . What were the 'jurisdictions and powers' of the Justices of the Court of King's Bench thus conferred upon the Supreme Court? It is said in Blackstone, Book 3, ch. 4, §42, that 'The jurisdiction of this court [Court of King's Bench] is very high and transcendent. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below . . . *It protects the liberty of the subject, by speedy and summary interposition.*' Subsequent legislative enactments did not derogate from the powers granted to the Supreme Court by the 1722 Act but rather confirmed and enlarged them".

In *Commonwealth v. Harris*, 351 Pa. 325, 333, Chief Justice MAXEY epigrammatically declared what should be the position of this Court in any case which comes to it, regardless of the manner in which it is brought, namely: ". . . this court if convinced in any case brought before it that a grievous wrong has been done

therein will promptly take appropriate measures to *undo* it . . ." (Italics in original Opinion.) If Hargett falsely accused Green, Green has been done a great wrong, and the most elementary principles of fair play imperiously dictate a new trial.

In *Commonwealth v. Krick,* 164 Pa. Superior Ct. 516, 519, the Superior Court announced the law to be: "In a civil action where there is incontrovertible evidence obtained after the trial that the verdict was rendered by reason of perjury by the litigant in whose favor it was entered, it is an abuse of discretion for the trial court to refuse a new trial and on appeal will be reversed . . . *There is even stronger support for the application of the rule in criminal cases where life and liberty are at stake."*

In *Kvaternik v. Yochim,* 360 Pa. 387, 389, this Court said equally as much: "There are authorities holding that if a party or an essential witness *admits* that he committed perjury at the trial, or it so appears *by incontrovertible* evidence, a new trial should be granted." (Italics in original opinion.)

In the case at bar the recanting witnesses both voluntarily admitted their perjurious utterances, and those utterances have not been controverted. The only interested party that could question the authenticity and reliability of Hargett's and Fleming's recantation is the Commonwealth, but the Commonwealth accepts their sworn statements as genuine and trustworthy. The only person who could object to the accusations of Hargett and Fleming would be the witness Suggs, but the Commonwealth asserts that he cannot be believed. Who is left to protest?

The Act of 1903 is built on the supposition that where the defendant asks for a new trial because of after-discovered evidence, the Commonwealth will op-

pose the granting of a new trial. The wording of the statute and its parliamentary setting do not envisage a situation where the Commonwealth would agree to a new trial, because in such a case there would be the natural assumption that if the sovereign power prosecuting a case concedes the necessity for a new trial, the Court would order the requested re-trial as a routine function. Of course, it is not imperative that the Court accept the Commonwealth's position, but it would need to be a most extraordinary case indeed for the Court to refuse a new trial when both litigating parties are of accord that perjury has been committed and justice requires a re-submission to the jury of the factual question involved.

I think we can take it for granted that there would have to exist a very strong set of exculpating circumstances supporting a prisoner who has already served eight years of a duly imposed life sentence, before a member of the prosecution staff would volunteer a statement in his behalf. Such a statement has not been lacking here. Assistant District Attorney Harris has gone on record: "For all these reasons, together with the fact that I had contacted Mr. Fleming in New York, plus the work of counsel in the interviewing of all the witnesses, *I am convinced that the two witnesses, Fleming and Hargett, were solicited to commit perjury.*"

In its brief to this Court on this very appeal, the Commonwealth still vigorously urges a new trial for William S. Green, and sums up the after-discovered evidence as follows: "1. Hargett admits that he lied at the trial and was suborned to commit perjury by Suggs. 2. Fleming was suborned to commit perjury by Suggs at the magistrate's hearing thus corroborating Hargett's testimony that Suggs was arranging perjured testimony for the trial of Green; further that

Suggs committed perjury by testifying that Green came to his, Suggs' room after the shooting for the purpose of hiding, for he, Fleming was in this room after the shooting and Green did not come there. 3. Contradictions by Suggs to the assistant district attorney of his testimony at the trial in material details and additional evidence of perjury by him as to his whereabouts immediately after the shooting.

A more detailed description of the after-discovered evidence is furnished in appellant's brief. *Much of this evidence was discovered as a result of an investigation conducted by the District Attorney's Office."*

The Commonwealth also points out that at a new trial the jury's verdict might well be different from the one rendered in 1947: "If all of the evidence now available were presented to a jury the evidence would be as follows: 1. Three witnesses to testify that defendant was *not* the slayer; 2. One witness, Caldwell, who hesitantly identifies defendant as the slayer, but whose eyesight is poor. 3. One witness, Suggs, that defendant was the slayer and that he afterwards came to his, Suggs' room. 4. One witness that defendant did not go to Suggs' room after the slaying. 5. One witness that Suggs did not go to a certain restaurant near the scene of the slaying. 6. Contradictory statements made by Suggs to the investigating assistant district attorney. 7. Two witnesses that Suggs suborned them to commit perjury. . . . In the face of this evidence the jury would now have only one credible witness placing the defendant at the scene of the slaying, Caldwell. As to Suggs a jury would be required to sift the testimony very carefully. Since the sole issue here is one of identification and the defense is alibi, great latitude should be permitted in the interest of justice. *Counsel for the Commonwealth is of the Opinion that a different result would be probable on a second trial."*

The Majority makes not the slightest mention in its opinion to this powerful argument, advanced—not by the defendant, not by defendant's counsel—but by the *Commonwealth* in behalf of a new trial for a convicted defendant!

The District Attorney is convinced that Hargett had no possible inducement to recant, except that of wishing to tell the truth. There is not in the whole record the slightest indication, suggestion, or breath of suspicion that Hargett confessed to having committed perjury at the original trial because he may have expected any reward for such recantation. To the contrary, so far as his personal fate is concerned, he had less cause to worry by remaining hidden in the forgotten woods of a forgotten trial than to make himself conspicuous by coming forward to confess having committed perhaps the most hideous crime of all, next only to murder itself. To lie and by that lie to rob a man of the precious gem of liberty, to strip from him his Christian name and brand him with a number, to drive him from his home and separate him from all that he holds dear, to entomb him in a living cemetery for the period of his natural life—what greater offense could there be against one's fellow-man? This is the offense to which Hargett confessed, for no apparent personal advantage or reward. If Hargett feared that his victim Green might wreak vengeance on him for having testified against him in Court, he had less to fear from him as he remained helplessly behind stone walls and iron bars than if he were free. In addition, Hargett had less to be concerned about his fellow-witnesses by remaining silent than, through speaking, to incur their enmity and hatred by accusing them of perjury and evil doing. Thus, Hargett's sworn confession is not a matter to be taken lightly.

There is no indication that Hargett and Fleming are demented. There is nothing to suggest that they are less than normal, rational human beings. In the absence of such evidence, how can their forthright sworn utterances be discarded without consideration?

Certainly it cannot be imagined that the District Attorney's Office with its trained staff, plus the county detectives who studied and investigated the case, were duped, deceived, and hoodwinked by a couple of uneducated mediocrities, devoid of any money, accomplices, or device with which to outwit an organization specially trained and equipped to uncloak mountebanks, impostors, and falsifiers. In the absence of such evidence, why should a Court with no personnel to investigate, assume that what has been incontrovertibly established is anything less than the truth? And if it is the truth, on what possible basis can Green be denied the opportunity to prove his innocence, untrammeled by the perjurious testimony which heretofore played so devastating a part in sending him to prison? Green does not ask that we declare him innocent. He only asks that he be given an opportunity to appear before a jury which will hear the case in an atmosphere cleared of the clouds of fearful doubt which have settled over the previous conviction.

The Majority's position in this case is a most anomalous one. The Act of 1903, which we have been discussing, reads as follows: "Whenever by petition, supported by after discovered evidence, it shall be made to appear to the supreme court that there is ground for substantial doubt as to the guilt of any prisoner convicted of murder of the first degree, the said court shall have power to authorize the court of oyer and terminer in which such prisoner has been convicted to grant a rule for new trial, nunc pro tunc, notwith-

standing the expiration of term in which such prisoner was convicted and sentenced; and thereupon the said court of oyer and terminer may, in its discretion, grant and proceed to hear such rule, as in other cases. Upon the termination of the hearing of such rule, if the court of oyer and terminer shall not deem the grounds sufficient it shall thereupon discharge said rule, and the proceedings shall terminate, and the judgment and sentence theretofore entered of record shall remain unaffected."

When the petition, with the after discovered evidence, was presented to us, we decided that there was "ground for substantial doubt as to the guilt" of the prisoner. We came to that conclusion without reservation. We could not have referred the case to the Court of Oyer and Terminer unless we were satisfied of that substantial doubt. What is a substantial doubt? It does not differ from the classical phrase, "reasonable doubt," except perhaps that it bespeaks an even firmer and more supportable basis for doubt. And in this connection it may be observed that in America the Rocky Mountains could be more easily budged than the rule that no accused person may be deprived of his liberty if there is a reasonable or substantial doubt as to his guilt.

If, under the Act of 1903, no steps were required to be taken beyond this Court's acknowledgment of substantial doubt as to Green's guilt, the prisoner would be entitled to an immediate release from prison. But, of course, there is another step. The Act provides for a hearing before a Court of Oyer and Terminer so that the opposing party may test the authenticity and reliability of the after-discovered evidence. This is done by means of a rule to show cause on the opposing party, namely, the Commonwealth. Such a rule did issue in

the lower Court. The Commonwealth, in replying to the rule and the allegations in the petition, did the surprising thing of not opposing but agreeing with the petitioner. This is a development which the Act did not anticipate or provide for. The Legislature would naturally have assumed, as already stated, that if the prosecuting authorities were convinced the prisoner should have a new trial, the Court would order such a trial as a matter of course. In view of the fact, however, that the potential opponent envisaged in the Act, namely the Commonwealth, did not in this case oppose the rule, the Court below held no hearing and disposed of the petition on the statements made by the recanting witnesses, plus the observations submitted by the District Attorney's Office. It thus considered the same evidence which had been considered by us—but it arrived at a conclusion opposite to ours. The lower Court passed on our deliberations and decided we were wrong, namely, that there was no substantial doubt as to the guilt of the prisoner Green. The case then came back to us on appeal, and the majority of this Court perceived nothing strange in the fact that a lower Court had reversed the findings of the Supreme Court!

This phenomenon would be worthy of a profound philosophical jurisprudential study, but, unfortunately, more is involved here than an oddity in the law or a vagary in procedure. A man's whole future is at stake, that is to say, his life, because he has been committed to the penitentiary for the remainder of his days. Thus, putting aside all philosophical considerations and discarding all euphemism, I must note the stark fact that this Court, the last resort of the aggrieved in our Commonwealth, refuses to take cognizance of uncontradicted evidence which proclaims that unmitigated perjury sat in the witness chair of a trial which condemned one of Pennsylvania's citizens to an endless doom.

The Majority does make one concession. It says that if the defendant is really innocent he does not need a new trial in order to achieve his freedom. He may go to the Pardon Board: "There is obviously another door open to the appellant if his further restraint is unjustified in the light of subsequent developments. He may ask the Board of Pardons to recommend that the Governor exercise his power to grant a pardon." But with this statement, the Majority strays more deeply into the fields of inconsistency and unreasonableness for, if the appellant's imprisonment is "unjustified in the light of subsequent developments," he is entitled to an acquittal by a jury of his peers, not to a pardon as an act of pity or clemency. If the path of pardon was to be the only or sufficient exit from an unmerited confinement and an undeserved disgrace, there would have been no need for the Act of 1903. The Legislature must be given credit for knowing that there was always the possibility of executive clemency in criminal cases, when it passed the law of 1903. It was because the General Assembly believed with reason that a jury's exoneration would mean more to a person unjustly accused and convicted of murder than a pardon, that it set up the precise machinery blue-printed in the Act of 1903.

Furthermore, this Court, as recently as June 25, 1956, expressed its views of depreciation of a pardon, as compared to an acquittal. In the case of *Commonwealth v. Cannon*, 386 Pa. 62, 123 A. 2d 675, the District Attorney in his opening address at the trial of the defendant, said: "This is not the first time that James Cannon took the life of another human being." The defendant was convicted and he appealed to this Court, the majority of which decided that the District Attorney was justified in making the admitted remark, even

though the defendant had received a full pardon from the Governor of Maryland for the crime to which the District Attorney had referred. I filed a Dissenting Opinion in that case, with which Mr. Justice JONES (now Chief Justice) concurred, but the remainder of the Court, as then constituted, saw no wrong in the Commonwealth's introducing in evidence, in a trial for murder, the record of a prior conviction of manslaughter, which had been wiped out by a pardon. The Majority of the Court went further and accepted as its own, the language of another Court which said that a pardon "did not obliterate the record of his [the defendant's] conviction or blot out the fact that he had been convicted."

This Court, therefore, has already gone on record to the effect that if a man is convicted of murder, and is then later proved innocent, through the processes of a pardon, he must nevertheless bear the brand of Cain throughout the remaining journey of his life. No matter how many witnesses recant, regardless of the unassailable proof of innocence presented to the Chief Executive of the Commonwealth and the Pardon Board, and in spite of the language of a pardon which may completely exonerate and clear him of guilt, this Court still insists that the once-convicted but now guiltless freeman must, so long as he lives, walk "a fugitive and a wanderer in the earth."

And that is the fate to which this Court recommends the already 8-year imprisoned William S. Green even though it be established that "his further restraint is unjustified in the light of subsequent developments." Naturally I cannot approve of so unjust and amazing a recommendation, and I accordingly and strenuously dissent.