Commonwealth *v.* Mosteller, Appellant.

84

Argued January 21, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Mark S. Refowich,* for appellant.

*Nicholas M. Zanakos,* Assistant District Attorney, with him *Charles H. Spaziani,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, December 20, 1971:

This appeal requires that we consider the value of a prosecutrix's recantation subsequent to trial, when her testimony at trial was the sole evidence upon which the Commonwealth depended to support the indictments against appellant for various sex crimes. We believe that on the record before us a new trial is necessary so that a new jury may pass on the prosecutrix's credibility in light of subsequent events.

Appellant was convicted of incest, statutory rape, and corrupting the morals of a minor in a trial before a jury on June 12 and 13, 1968. The Commonwealth's case rested entirely upon the testimony of Frieda Mosteller, appellant's fifteen year old daughter. Under oath at trial, she recounted how on the afternoon of January 23, 1968, her father entered the bathroom where she was bathing and "started playing with my busts." According to Frieda, her father then told her to come visit him nude in his bedroom, which she did. She lay on the bed on her back, and her father alleged-

ly had intercourse with her. She testified she was penetrated for approximately five minutes; she experienced no pain, and no emission occurred.

Frieda stated she then dressed and went downstairs while her father went to sleep. When her sister returned from school some fifteen minutes later, Frieda told her of the alleged incident. The story was repeated to her mother shortly thereafter.

The following day, Frieda was called for at school by her step-brother and his wife, who had heard of Frieda's accusation. They took the girl to the Easton police, who in turn had her examined at the hospital.

Dr. Linwood Pearson, a specialist in obstetrics and gynecology, appeared as a witness on behalf of the Commonwealth. He testified that his examination of Frieda on January 24, 1968 in the emergency ward at the Easton Hospital disclosed no evidence of perineal or labial laceration; her hymen was intact and uninjured. A vaginal cotton swab test and a rectal examination were also negative.

Mrs. Mosteller, Frieda's mother, testified for the defense. She stated that after she had been informed of what had allegedly occurred, she took Frieda into the bathroom and examined her, at which time "I seen everything normal." She also stated that when she returned home, Frieda was sitting downstairs and in no way appeared disturbed or upset.

Appellant himself took the stand and strenuously denied having done any of the acts attributed to him by his daughter. He admitted being home alone with Frieda but asserted he had been asleep the entire time.

Following his conviction, appellant submitted motions for a new trial and in arrest of judgment, which were argued on March 4, 1969. In his argument, appellant abandoned the original grounds for his written motion of June 17, 1968, contending instead that he

was entitled to a new trial because of after-discovered evidence taken on June 28, 1968, in the form of a sworn statement made by Frieda and later testimony of Mrs. Mabel Vulcano, Frieda's great aunt at a court hearing.

Frieda had returned to live with her parents shortly after the alleged incident occurred in January, 1968. She remained at home until May 1, 1968, when she was adjudged a dependent child by the Juvenile Court of Northampton County. Protective service was ordered for her through the Northampton County Children's Bureau, and she was instructed to live with her maternal grandmother, with whom she stayed until June 25, 1968 (thirteen days after the verdict). Frieda then voluntarily returned home. Two days later her sister telephoned their father's attorney and informed him that Frieda wished to retract her trial testimony.

Frieda was examined by the district attorney in the presence of defense counsel and a representative of the Children's Bureau on June 28, 1968. She stated under oath that her testimony at trial had been untrue, and stressed, ". . . [h]e did not do it, and I don't want to see him go to jail for something he didn't do, and I want to be home with my parents." Her explanation for her earlier falsehoods was, ". . . [b]ecause people was telling me to do one thing and other people were telling me to do another thing, and I was so mixed up I didn't know what to say." According to Frieda, her grandmother and her uncle had pushed her into testifying at trial. She had merely told her sister that "my father got after me," and her sister then relayed this information to their mother. She was scared to tell the truth at trial because her ". . . grandmother and them was in court, and if I turned around and told the other story, that he didn't touch me, then I didn't know what they would think."

Frieda continued by persistently denying every aspect and detail of her previous trial testimony despite

numerous warnings from the district attorney that she was in effect admitting the crime of perjury, which, it was explained to her, carried a penalty "of up to $3,000 fine and up to seven years in jail." Frieda did not waiver in her recantation.

A hearing was held before the court on February 3, 1969, at which time Mrs. Mabel Vulcano, Frieda's great aunt, testified that on May 14, 1968, (approximately one month prior to appellant's trial) she had asked Frieda if her father had actually done anything at all to her, and Frieda replied in the negative. Mrs. Vulcano explained that she had not made this fact known previously because her brother had instructed her to remain quiet. Frieda did not testify at this hearing.

The court en banc concluded that a new trial was not warranted under the circumstances. The Superior Court affirmed per curiam without opinion on March 19, 1970, with Judge HOFFMAN filing a dissenting opinion. We granted allocatur.

This Court has often reiterated that: ". . . 'A new trial in a criminal case will be awarded on the ground of after-discovered evidence where the evidence in question (1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely for impeaching credibility of a witness; and (4) is of such nature and character that a different verdict will likely result if a new trial is granted.'" *Commonwealth v. Coleman*, 438 Pa. 373, 376-77, 264 A. 2d 649, 651 (1970).

Our general view of recanting testimony is equally settled: "The well-established rule is that an appellate court may not interfere with the denial or granting of a new trial where the sole ground is the alleged recanta-

tion of state witnesses unless there has been a clear abuse of discretion. Commonwealth v. Green, 387 Pa. 515, 128 A. 2d 577 (1957); Commonwealth v. Sholder, 201 Pa. Superior Ct. 642, 644-645, 193 A. 2d 632 (1963).

"Recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Commonwealth v. Scull, 200 Pa. Superior Ct. 122, 130, 186 A. 2d 854 (1962). There is no less reliable form of proof, especially when it involves an admission of perjury. Commonwealth ex rel. Leeper v. Russell, 199 Pa. Superior Ct. 93, 96, 184 A. 2d 149 (1962), Commonwealth v. Sholder, supra." *Commonwealth v. Coleman,* supra at 377, 264 A. 2d at 651.

However, we have not previously been presented with precisely the factual situation that now confronts us. Frieda gave the *only* testimony which could possibly have led to appellant's conviction. Not an iota of other corroborating evidence was offered. To the contrary, the testimony of Frieda's mother and the medical evidence supported appellant's version of the incident and the recantation testimony. Furthermore, Frieda's retraction was corroborated by her great aunt.

We are in accord with the court en banc and Judge HOFFMAN's dissent that Frieda's deposition of June 28 constituted after discovered evidence. It was not available until after the trial, it was not merely corroborative, it will not be used for mere purposes of impeachment, and it unquestionably is of such character as to probably result in a different verdict if a new trial is held.

Upon careful consideration, we believe it was a clear abuse of discretion not to award a new trial under these circumstances and thereby allow a new jury to pass on the child prosecutrix's credibility. Rape, as Lord HALE observed in the seventeenth century, ". . . is an

accusation easily to be made and hard to be proved; and harder to be defended by the party accused, tho never so innocent." I M. Hale, Pleas of the Crown 635. In recognition of this truism, some jurisdictions have adopted the rule that uncorroborated testimony of a prosecutrix is insufficient evidence to support a conviction of rape. See, e.g., N.Y. Penal Law §130.15 (McKinney 1967); see generally 7 Wigmore, Evidence §2061 (3d ed. 1940).

False accusations in sex crimes are generally conceded to be far more frequent than untrue charges of other crimes. As one author has summarized: "A woman may accuse an innocent man of raping her because she is mentally sick and given to delusions; or because, having consented to intercourse, she is ashamed of herself and bitter at her partner; or because she is pregnant, and prefers a false explanation to the true one; or simply because she hates the man whom she accuses." Note, Corroborating Charges of Rape, 67 Col. L. Rev. 1137, 1138 (1967) (footnote omitted). See also, *Wedmore v. State,* 237 Ind. 212, 231-37, 143 N.E. 2d 649, 657-61 (1957) (dissenting opinion which extensively reviews medical authorities on subject).

We do not mean to imply that we are today in any way altering the established rule in this Commonwealth that uncorroborated testimony of one witness—the victim—can be sufficient to sustain a conviction of rape. See, e.g., *Commonwealth v. Ebert,* 146 Pa. Superior Ct. 362, 22 A. 2d 610 (1941); *Commonwealth v. Oyler,* 130 Pa. Superior Ct. 405, 197 Atl. 508 (1938). However, where as here the defendant's conviction is based completely on testimony of the child prosecutrix and the truth of that testimony is open to serious question because of the testimony of a disinterested medical witness, a subsequent recantation of testimony as supported by this record necessitates a new trial.

The Superior Court has previously arrived at a similar result in a remarkably analogous situation. In *Commonwealth v. Krick,* 164 Pa. Superior Ct. 516, 67 A. 2d 746 (1949), the defendant was convicted of statutory rape of a twelve year old girl. Slightly more than two weeks after the end of the trial the girl retracted her testimony, stating her father had told her to give false evidence, which she did out of revenge for the mother's leaving home. In a unanimous opinion the Superior Court declared: "Freda's letter and affidavit do not merely impeach her credibility but completely destroy and obliterate the testimony of the one witness upon whose testimony the defendant was convicted. The jury's verdict cannot be sustained without her testimony. In effect the young girl says that she committed perjury, and it was upon her perjured testimony that the defendant was convicted. . . . In the absence of sworn evidence impeaching the girl's retraction a new trial should have been granted." Id. at 520, 67 A. 2d at 749.

In the present case, not only is there nothing to contradict Frieda's recantation, there is evidence from her great aunt that Frieda admitted a month prior to trial that she had fabricated the story. Additionally, Frieda persisted in her retraction despite having been informed that she was thereby subject to criminal charges for perjury and a substantial prison term. This was a clear declaration against interest entitled to considerable credibility, unlike the normal retraction by a co-conspirator who is already in prison and realistically has little to lose by attempting to free his partner. See, e.g., *Commonwealth v. Coleman,* supra; *Commonwealth v. Collins,* 436 Pa. 114, 259 A. 2d 160 (1969).

Accordingly, the order of the Superior Court is reversed and the motion for a new trial granted.

Mr. Justice BARBIERI dissents.

DISSENTING OPINION BY MR. JUSTICE POMEROY:

The majority opinion, while correctly stating what has been the law in cases of this sort, reaches what I consider a wrong result on the facts, and I must accordingly dissent. As the Court reaffirms, "[r]ecanting testimony is exceedingly unreliable, and it is the duty of the [trial] court to deny a new trial where it is not satisfied that such [recanting] testimony is true." *Commonwealth v. Coleman,* 438 Pa. 373, 376-77, 264 A. 2d 649, 651 (1970). See also, e.g., *Commonwealth v. Lopinson,* 427 Pa. 284, 312, 313, 234 A. 2d 552 (1967); *Commonwealth v. Palarino,* 168 Pa. Superior Ct. 152, 155, 77 A. 2d 665 (1951). For this reason, "[t]he well established rule is that an appellate court may not interfere with the denial or granting of a new trial where the sole ground is the alleged recantation of state witnesses unless there has been a clear abuse of discretion." *Commonwealth v. Coleman,* supra.

In the case at bar the trial judge was *not* satisfied that the recanting statement was true. He reached this conclusion after a careful analysis of the recanting testimony and the evidence which tended to corroborate it, viewed against the background of the trial evidence and his own observation of the demeanor of the prosecutrix on the witness stand at trial. The reasons leading him to the belief that Frieda Mosteller was telling the truth at the trial and not in her recanting deposition are set forth in Judge PALMER'S opinion for the court *en banc,* from which I quote:

"Upon a close examination of the record, we are not persuaded Frieda perjured herself at the trial. In this regard we recognize that in this, as in most cases of sexual assault, there were, or are, no witnesses. Of necessity, therefore, the law has always permitted convictions of such crimes based on the uncorroborated testimony of the victims. Where, as here, the victim

subsequently recants, and it was her testimony, and hers alone, which served to convict the defendant, the difficulties in determining where the truth lies are manifest. There are, however, certain factors which shed some light and which must be considered.

"Thus it is to be noted that fifteen minutes after the assault Frieda told her sister, the first person to come into the home, what had occurred. Within a matter of minutes thereafter she told her mother. The next day she told the same story to her stepbrother and his wife, and then to the police. Subsequently, before trial, she affirmed this story before the Juvenile Court, as a result of which protective custody was awarded to the Northampton County Children's Bureau. Thereafter she recounted the same facts to a judge and jury. Thus, from January 23, 1968, until she gave her recanting statement on June 28, 1968, she never waivered in the account which she gave at the trial of the incidents which occurred between her and her father on January 23. It must also be noted she did not change this story until two days after she elected to leave her grandmother's home and return to live with her mother and father and the rest of her family.

"On the other hand, we recognize Frieda's story was not corroborated by any other testimony in the case; both the examination by her mother and that of the doctor disclosed no physical evidence which would support her story.

"The author of this Opinion was the trial judge. He clearly recalls Frieda's demeanor on the witness stand. While she wept at times during the course of her examination, her testimony was given in a forthright and convincing manner. She was an intelligent and candid witness. There was no indication her testimony was inspired by malice, spite, or a feeling of hatred for her father. Nor did the testimony of any of the other wit-

nesses suggest any reason why Frieda would testify falsely.

"On the other hand, the record before us does not 'incontrovertibly' demonstrate Frieda told the truth in her recanting statement of June 28, 1968. In this statement she does not state why, if her testimony at the trial was false, she ever made up the story in the first place. All she does state is that she testified as she did because, having told her grandmother and her uncle the same story previously, she thought if she testified to the contrary they would not believe her and also 'because my grandmother and them was in court, and if I turned around and told the other story that he didn't touch me, then I didn't know what they would think.'

"Similarly, while the testimony at trial disclosed no motive for Frieda to tell an untrue story, the motive for her recanting testimony is apparent. Thus, the record discloses she first indicated she wished to change her story sometime between June 25 and June 27, 1968, immediately upon her voluntary return to her parents' home from the home of her grandmother where she admittedly was unhappy. Obviously this young girl must have felt her parents—with whom she wanted to live—resented her part in convicting her father. While there was no evidence this resentment was expressed, it must have been apparent to her, her only hope of being accepted back into the family was to recant the testimony she had given at the trial.

"It also must be remembered Frieda was not physically injured by her father and while she testified she told him she was 'scared', when she realized what he proposed to do, there was no indication in her testimony that what occurred permanently estranged her from him. The fact she voluntarily returned home from her grandmother's while her father was still there

and while she could have remained away from home, demonstrates this to be true. Thus, while what he did was a crime under the law and 'scared' this fifteen year old girl at the time it was done, there was no evidence it was such an enormity in her view as, when weighed with the alternative of being able to return to her home and live with her parents, would have caused her not to choose the latter course."

On the basis of this record, I do not see how it can be said that the lower court committed a clear abuse of discretion.

It may be that the majority opinion, while paying lip service to the prior law on this subject, in effect limits its application to the retraction of a previously convicted co-conspirator or co-felon, and enunciates a new rule as to the recantation of one who is the victim of and sole witness to a sex crime; the new rule would in effect require a new trial in the latter type of case. If that is the intention of the majority, I am not persuaded that such a modification is called for or is wise.

We are dealing here not with a tort claim between private parties,[1] but with a crime against the state. It seems to me eminently sound that the quality of the so-called "after-discovered evidence" should be scrutinized with the greatest care by the trial judge before awarding a new trial. I think his duty still should be to refuse a new trial if not satisfied that the recanting statement is true.

The majority argue that a witness-victim has "more to lose" by admitting to trial perjury in retraction

---

[1] In civil cases the rule seems to be that it is an abuse of discretion for a trial court to refuse to grant a new trial where it appears, by "incontrovertible" evidence obtained after trial, that the verdict was rendered, or materially enhanced in amount, by reason of the perjury of the litigant in whose favor it was entered. *Candelore v. Glauser*, 291 Pa. 582, 140 Atl. 525 (1928) ; see also *Blake v. Marinelli*, 357 Pa. 314, 53 A. 2d 550 (1947).

than does a co-conspirator, already in prison. Assuming, *arguendo,* that this is so, it is only one element going to the believability of the retraction; it should certainly not by itself carry sufficient credence to warrant a new trial. I am aware that in rape cases false accusations are not infrequent; the same factors that are responsible for this phenomenon can operate to produce false recantations.

Mr. Chief Justice BELL joins in this dissent.