J-S25017-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN BETZ | : | |
| | : | |
| Appellant | : | No. 1287 MDA 2019 |

Appeal from the PCRA Order Entered July 11, 2019
In the Court of Common Pleas of Lebanon County Criminal Division at
No(s): CP-38-CR-0000381-2001

BEFORE: LAZARUS, J., DUBOW, J., and KING, J.

MEMORANDUM BY DUBOW, J.:                                   **FILED JULY 23, 2020**

Appellant, John Betz, appeals from the Order entered on July 11, 2019, which denied and dismissed his third Petition for collateral relief filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-46. After careful review, we affirm on the basis of the PCRA court's July 11, 2019 Opinion.

The PCRA court provided a through and accurate factual and procedural history, which we adopt for purposes of this appeal. *See* PCRA Ct. Op., filed 7/11/19, at 1-13. In sum, a jury convicted Appellant of Rape and related charges stemming from a December 2000 incident where Appellant sexually assaulted 18-year-old T.P. ("Victim") in the basement of Appellant's mother's home. On August 12, 2002, the trial court found Appellant to be a sexually violent predator ("SVP") and sentenced Appellant to an aggregate term of 98 months' to 27 years' incarceration.

Appellant timely appealed and, on May 7, 2004, this Court reversed Appellant's SVP designation but affirmed Appellant's Judgment of Sentence in all other respects. Appellant filed a Petition for Allowance of Appeal, which our Supreme Court denied on January 25, 2005. **Commonwealth v. Betz**, 855 A.2d 127 (Pa. Super. 2004), *appeal denied*, 868 A.2d 1196 (Pa. 2005).

On November 7, 2018, Victim, who is currently incarcerated in the Arizona State Correctional System, drafted a letter to the court and the District Attorney's Office indicating that she was not "fully truthful" in the testimony she offered at trial against Appellant. **See** Exhibit A, Victim's Letter. On December 7, 2018, Appellant received a copy of Victim's letter.

On January 28, 2019, Appellant filed the instant PCRA Petition, his third, acknowledging that the PCRA Petition was untimely under the PCRA, but averring that Victim's letter fell under the newly-discovered fact exception to the PCRA's timeliness requirements pursuant to 42 Pa.C.S. § 9545(b)(1)(ii). Appellant further asserted that Victim's letter and averments constituted after-discovered exculpatory evidence that would have changed the outcome of the trial if it had been introduced.

On June 14, 2019, the PCRA court held a hearing on Appellant's Petition.[1] Victim and Appellant both testified. Relevant to this appeal, with prompting, Victim testified to several inaccuracies or omissions in her trial

_____

[1] At the hearing, the Commonwealth conceded that Appellant satisfied the newly-discovered fact exception to the PCRA time-bar. **See** 42 Pa.C.S. § 9545(b)(1)(ii); N.T. PCRA Hearing, 6/14/19, at 44.

- 2 -

testimony, including that: (1) Victim and Appellant had been verbally flirting before the assault began; (2) Victim did not disclose to police that she initially went to Appellant's mother's home to mediate a dispute between Appellant and a mutual friend about a home invasion the two of them had allegedly committed; and (3) Victim went upstairs after the assault, saw Appellant's mother, and used the telephone to call someone for a ride home. N.T. PCRA Hearing, 6/14/19, at 1-12, 19, 28-29, 33. Victim also testified that she used drugs recreationally around the time of the assault but, after the assault, she became addicted to both heroin and methamphetamines. *Id*. at 18, 29, 31, 37. Victim explained that because of her long-term drug use, she suffers from significant memory issues, has a diagnosis of drug-induced psychosis and hears voices, and only vaguely remembers the sexual assault or her testimony at trial. *Id*. at 9, 29, 30, 36. Victim testified that she is currently serving a prison sentence for drug charges; while incarcerated she has become sober and has newfound religious faith; and she knows how bad prison can be and she does not "want to be responsible for destroying somebody's life." *Id.* at 18, 24-25.

Appellant maintained the incident was consensual. *Id*. at 44-46.

On July 11, the PCRA court issued an Order and Opinion that denied Appellant's PCRA Petition because Victim was not credible and her testimony would not have changed the outcome of the trial.

Appellant timely appealed. Both Appellant and the PCRA court complied with Pa.R.A.P. 1925.

Appellant raises the following issue for our review:

The [PCRA] court erred in holding that [Appellant] did not meet all four elements of the after-discovered evidence test, particularly that the after-discovered evidence would not have likely compelled a different verdict. To compel a different verdict, the after-discovered evidence must be of such character and significance that it would have likely changed the jury's original verdict, thus warranting a new trial. Was the after-discovered evidence of such character and significance that it would likely have compelled a different verdict?

Appellant's Br. at 6.

We review the denial of a PCRA Petition to determine whether the record supports the PCRA court's findings and whether its order is otherwise free of legal error. *Commonwealth v. Fears*, 86 A.3d 795, 803 (Pa. 2014). This Court grants great deference to the findings of the PCRA court if they are supported by the record. *Commonwealth v. Boyd*, 923 A.2d 513, 515 (Pa. Super. 2007). "Further, the PCRA court's credibility determinations are binding on this Court, where there is record support for those determinations." *Commonwealth v. Anderson*, 995 A.2d 1184, 1189 (Pa. Super. 2010) (citation omitted). We give no such deference, however, to the court's legal conclusions. *Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa. Super. 2012).

To be eligible for relief pursuant to the PCRA, Appellant must establish, *inter alia*, that his conviction or sentence resulted from one or more of the enumerated errors or defects found in 42 Pa.C.S. § 9543(a)(2). Appellant must also establish that the issues raised in the PCRA petition have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3).

Relevant here, the PCRA provides relief for a petitioner who demonstrates his conviction or sentence resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S. § 9543(a)(2)(vi). To establish a claim of after-discovered evidence, a petitioner must prove that: "(1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict." *Commonwealth v. Sepulveda*, 144 A.3d 1270, 1276 n.14 (Pa. 2016). The four-part test is conjunctive and if one prong is not satisfied, there is no need for analysis of the remaining prongs. *Commonwealth v. Pagan*, 950 A.2d 270, 293 (Pa. 2008).

Notably, our Supreme Court has explained, "[r]ecanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. There is no less reliable form of proof, especially when it involves an admission of perjury." *Commonwealth v. Mosteller*, 284 A.2d 786, 788 (Pa. 1971) (citations omitted).

Appellant avers that the PCRA court erred when it concluded that Victim's testimony at the PCRA hearing was not credible and would not likely compel a different verdict. Appellant's Br. at 15. Appellant argues that Victim's sobriety and religious faith support her credibility. *Id*. at 15. Appellant also contends that Victim's admissions that she initiated the

"encounter," was flirting with Appellant prior to the "encounter," and saw Appellant's mother directly after the "encounter" constitute a recantation of Victim's claim that she was raped. ***Id.***

The Honorable Robert J. Eby has authored a comprehensive, thorough, and well-reasoned Opinion, citing to the record and relevant case law in addressing Appellant's claim. ***See*** PCRA Court Opinion, 7/11/19, at 16-27 (concluding that : (1) Victim's testimony at the PCRA hearing was not credible due to memory challenges; and (2) Victim's testimony at the PCRA hearing, even if credible, was not exculpatory and would not likely have compelled a different verdict). The record supports the PCRA court's findings and its Order is otherwise free of legal error. We, thus, affirm on the basis of the PCRA court's July 11, 2019 Opinion.

Order affirmed.

Parties are instructed to attach a copy of the PCRA Court's July 11, 2019 Opinion to all future filings.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/23/2020

- 6 -

IN THE COURT OF COMMON PLEAS

OF LEBANON COUNTY, PENNSYLVANIA



ENTERED & FILED
CLERK OF COURTS
LEBANON, PA.

2019 JUL 11 ☐ 2: 17

## CRIMINAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF | : | |
| PENNSYLVANIA | : | |
| | : | No.  CP-38-CR-381-2001 |
| v. | : | CP-38-CR-653-2001 |
| | : | |
| JOHN BETZ | : | |

Appearances:

Megan Ryland-Tanner, Esq.                    For the Commonwealth

Kaitlyn Clarkson, Esq.                        For the Defendant

## OPINION BY EBY, S.J., JULY 11, 2019

Before the Court is the third PCRA Petition filed by the Defendant at Action Number CP-38-CR-381-2001.[1] The Defendant was convicted in April of 2002 of Rape and other sexual assault charges stemming from a December, 2000 incident in the city of Lebanon. Defendant now argues that

---

[1] While including Action Number CP-38-CR-653-2001 in the case caption of his Petition, Defendant has not included any claims for relief related to that action number. Defendant pleaded nolo contendere to a charge of stalking the victim on May 6, 2002 at that action number and was sentenced as part of an aggregate sentencing scheme with the sexual assault charges at issue in the instant Petition.

1

his accuser has, as of November of 2018, made a "complete recantation" of her trial testimony regarding the nonconsensual nature of the parties' sexual encounter and that therefore he is entitled, under the after-discovered evidence category of the PCRA, to a new trial. While we agree with Defendant that he has met the standard for an exception to the timeliness requirements of the PCRA and that we thus have jurisdiction to consider the merits his claim, we do not believe that he is entitled to relief. Having heard the testimony of the victim in the case at a hearing on June 14, 2019, we do not agree with Defendant's characterization of the victim's testimony as a recantation that would likely result in a different verdict. Moreover, mindful of the notorious unreliability of recantation testimony in general and the specific limitations in recollection expressed by the victim herself as the result of years of drug abuse, we intend to deny the relief requested and dismiss the Petition before us.

## I. Factual and Procedural History

On May 25, 2001, the Commonwealth filed a Criminal Information against the Defendant, charging him with one count each of Rape, Sexual Assault, and Indecent Assault following an incident on December 31, 2000. At trial on April 3 and 4, 2002, the Commonwealth presented the testimony of seven witnesses, including the testimony of the victim, T.P.

2

T.P. testified at trial that on December 31, 2000, at approximately 12:30 p.m., she received a telephone call from Defendant. (N.T. 4/3/02 at 24-25) Prior to that date, T.P. and the Defendant had been friends for approximately five years but had never had any type of romantic involvement. (N.T. 4/3/02 at 26) The Defendant asked T.P. to come over to his mother's house to hang out because there was something that he wanted to discuss with her. (N.T. 4/3/02 at 26-27) William Panagatos, a friend of the Defendant, gave Defendant a ride to T.P.'s house, where T.P. got into the vehicle and drove with Panagatos and the Defendant to the Defendant's house. (N.T. 4/3/02 at 28)

After Panagatos dropped the Defendant and T.P. off at the Defendant's house, the Defendant and T.P. went into the basement.[2] (N.T. 4/3/02 at 28) The Defendant told the victim to be quiet because he thought his mother was at home upstairs. (N.T. 4/3/02 at 29). The Defendant and T.P. talked in the basement for approximately forty-five (45) minutes. (N.T. 4/3/02 at 31) During the course of that conversation, the Defendant asked if T.P. would do a favor for him,[3] and she indicated that she would try to help him. (N.T. 4/3/02 at 32).

When T.P. eventually told the Defendant that she had to leave, he began "acting funny" and insisted that she stay. (N.T. 4/3/02 at 31-32) T.P.

---

[2] The basement was accessible only from an outside entrance. (N.T. 4/3/02 at 14)

[3] The substance of the favor was not revealed to the jury at trial. However, in Chambers before trial, counsel disclosed that the Defendant allegedly asked the victim to lie for him regarding his involvement with a burglary. (N.T. 4/3/02 at 14) The Defendant subsequently entered a guilty plea to the charges resulting from this burglary.

then attempted to leave, but before she was able to reach the door, the Defendant grabbed her from behind and placed his left arm across her chest. (N.T. 4/3/02 at 32, 33, 36) The Defendant told T.P. to be "a good girl" and not to say anything. (N.T. 4/3/02 at 34) He told her that if she did not say anything, she would not get hurt. (N.T. 4/3/02 at 34) The Defendant then pulled T.P. backwards. (N.T. 4/3/02 at 34) While the Defendant restrained T.P. by holding her from behind with his left arm across her chest, the Defendant grabbed the T.P.'s jeans with his right hand, unbuttoned the top part, yanked the zipper down, and pulled T.P.'s jeans and underwear down to her knees. (N.T. 4/3/02 at 35)

T.P. asked the Defendant what he was doing and told him to stop. (N.T. 4/3/02 at 36) The Defendant forced T.P. onto the floor so that she was positioned on her hands and her knees, with his knees positioned on her feet. (N.T. 4/3/02 at 37-38) With his right hand, the Defendant grabbed T.P.'s hair and yanked her head back. (N.T. 4/3/02 at 37-38) The Defendant then engaged in vaginal sexual intercourse with T.P. (N.T. 4/3/02 at 39). T.P. could not move or see anything that was happening because of the way that the Defendant had her positioned. (N.T. 4/3/02 at 40) When T.P. attempted to move away from the Defendant, he tightened his grip on her hair. (N.T. 4/3/02 at 40) The Defendant continued to have sexual intercourse with T.P. for a few minutes. (N.T. 4/3/02 at 41)

T.P. began crying at the beginning of the assault and continued to do so the whole time. (N.T. 4/03/02 at 42) She did not want the Defendant to

4

do what he was doing, and she wanted him to let her go home. (N.T. 4/03/02 at 42) She had told him "no" initially when he pulled her backwards and continued to say so throughout the entire sexual encounter. She told the Defendant she wouldn't tell what he had done if he just let her go. She didn't want him to hurt her. (N.T. 4/03/02 at 43)

When the Defendant finally stopped penetrating T.P., he pushed T.P. over onto her side so that she was looking up at him and then ejaculated upon her face and sweater. (N.T. 4/3/02 at 41-42) The Defendant laughed, told her to get up and to get out, and said that T.P. disgusted him. (N.T. 4/3/02 at 42) T.P. got up, pulled up her pants, and ran out of the door. (N.T. 4/3/02 at 42-43) She ran home. (N.T. 4/3/02 at 44)

Once at home, T.P. telephoned some friends to talk. (N.T. 4/3/02 at 44) Anthony Miles, one of those friends, told her to call the police, which she did. (N.T. 4/3/02 at 45) Officer John Sheaf of the Lebanon City Police Department came to T.P.'s house in response to her call. (N.T. 4/3/02 at 45, 63) Upon arrival, Officer Sheaf observed that T.P. was very shaken up and distressed. It was obvious she had been crying, and her demeanor was very broken up. (N.T. 4/3/02 at 64) At Officer Sheaf's recommendation, T.P. went to the hospital. (N.T. 4/3/02 at 45) She did not shower or change the clothes from what she was wearing at the time of the incident. (N.T. 4/3/02 at 45) At the hospital, a rape kit test was performed upon T.P. (N.T. 4/3/02 at 46) Subsequent forensic testing revealed the presence of spermatozoa on T.P.'s jeans and sweater. (N.T. 4/3/02 at 87-88)

5

Detective Todd Breiner of the Lebanon City Police Department testified that he was assigned to investigate the incident, and he interviewed T.P. on both January 4, 2001 and January 12, 2001. (N.T. 4/3/02 at 123-124) During both interviews with Detective Breiner, T.P. gave accounts of the incident that were consistent with T.P.'s testimony at trial. On January 4, 2001, Detective Breiner took photographs of the victim's knees, because both of her knees appeared discolored. (N.T. 4/3/02 at 128)

Trooper Dominic Visconti of the Pennsylvania State Police testified that he assisted Detective Breiner in an interview of Defendant on January 12, 2001.[4] (N.T. 4/3/02 at 108-109) When questioned about the rape incident at the interview, Defendant told Detective Breiner and Trooper Visconti that he knew T.P. by her first name only and that he had never had any sexual contact with her. (N.T. 4/3/02 at 113, 132) Only after Detective Breiner questioned Defendant regarding his knowledge of the concept of physical evidence did Defendant admit to having "consensual" sexual intercourse with T.P. on the date in question. (N.T. 4/3/02 at 113, 133)

The Defendant indicated that he and T.P. went into the basement of his home and had casual conversation, during which Defendant made reference to T.P's level of promiscuity. (N.T. 4/3/02 at 133-134, 115) Defendant indicated that the victim initially performed oral sex upon him,

___

[4] Trooper Visconti participated in the interview of Defendant because he was investigating Defendant's involvement with the burglary to which Defendant eventually pleaded guilty. (N.T. 4/3/02 at 118)

after which he put a condom on his penis and had vaginal sexual intercourse with the victim in a standing position. (N.T. 4/3/02 at 115, 134) Eventually, they stopped having vaginal sexual intercourse because "he got bored just slapping skin," so he removed the condom from his penis and had the victim perform oral sex upon him until he ejaculated upon her clothing and face. (N.T. 4/3/02 at 115-116, 134-135) The Defendant stated that he ejaculated upon the victim's clothing and face, because he felt that it was rude to ejaculate in her mouth. (N.T. 4/3/02 at 116, 135)

During the January 12, 2001 interview, the Defendant also stated that, while he was having sexual intercourse with the victim, he thought to himself, "this girl is ugly, why am I even f--king her." (N.T. 4/3/02 at 135-136) He also indicated that he was a legend in Lebanon with women. (N.T. 4/3/02 at 136) The Defendant recounted that after he ejaculated, he and T.P. went upstairs in the home, and eventually William Panagatos came back to his house and gave T.P. a ride home. (N.T. 4/3/02 at 116, 135) The Defendant testified on his own behalf at trial, maintaining that he had consensual sexual intercourse with the victim. (N.T. 4/3/02 at 158)

After considering the evidence presented at trial, the jury found Defendant guilty of the offenses lodged against him. The Defendant subsequently entered a plea of no contest to the charge of Stalking captioned at Action Number 2001-10653.

On August 12, 2002, the Court conducted a Megan's Law II hearing and ultimately determined that the Defendant was a sexually violent

7

predator. The Court then sentenced Defendant to an aggregate term of ninety-eight (98) months to twenty-seven (27) years' imprisonment as a result of his convictions at Criminal Action Numbers 2001-10381 and 2001-10653.

The Defendant filed a Post-Sentence Motion on August 22, 2002. Following an evidentiary hearing on that Motion on December 19, 2002, this Court denied the Defendant's Post-Sentence Motion. The Defendant filed a Notice of Appeal on April 3, 2003. On May 7, 2004, the Superior Court issued a Memorandum Opinion reversing this Court's classification of the Defendant as a sexually violent predator. However, the Superior Court affirmed the Defendant's judgments of sentence in all other respects. The Defendant filed a Petition for Allowance of Appeal, which the Supreme Court denied on January 25, 2005.

The Defendant filed his first PCRA Petition on April 26, 2006. Following an evidentiary hearing on October 30, 2006, this Court denied relief and dismissed the Petition. On November 2, 2007, the Superior Court quashed the Defendant's appeal as untimely.

The Defendant filed his second PCRA Petition on April 9, 2012. On August 28, 2012, this Court issued a 907(1) Order and Opinion indicating an intent to dismiss the Defendant's second PCRA Petition without a hearing. The Defendant failed to file a Response within the afforded time, and the Court dismissed the Petition on September 26, 2012. The

Defendant appealed, but the Superior Court ultimately dismissed his appeal for failure to file a brief on August 12, 2013.

Thus, the PCRA Petition currently before the Court is the Defendant's third in the instant matter. On November 7, 2018, T.P., who is currently an inmate in the Arizona State Correctional System, drafted a letter to the Court and District Attorney's Office indicating that she was not "fully truthful" in the testimony she offered at trial against the Defendant. PCRA Petition January 28, 2019 at ¶7, Exhibit A; N.T. 6/14/19 at 7, Exhibit 1. The letter included the following statements:

- "I lied it was consentual (sic) to start-it just got ugly"

- "[O]riginally I wasn't correct when I didnt (sic) admit to an original attraction to him."

- "I didn't lie in the acts of what happened. But due to that main factor and now my own personal sexual encounters for the last 15 [years] . . . I put myself in the situation, and [through] the years Ive (sic) had 1000 [times] worse."

- "Due to my conversion and faith in Christ and my step work in AA/NA and my moral invatory (sic) I feel the nessity (sic) to try to clarify on his expecially (sic) since you had marked him under Megan's Law making him a child molester as well as a rapest (sic) and my heart and soul doesn't (sic) sit well with that..."

*Id.* On December 7, 2018, the Defendant received correspondence from the District Attorney's Office, which included an attached copy of T.P.'s letter. PCRA Petition January 28, 2019 at ¶7.

On January 28, 2019, after retaining counsel, the Defendant filed the PCRA Petition currently pending before the Court.[5] The January 28, 2019 Petition alleged that Defendant is entitled to relief under 42 Pa.C.S.A. §9543(a)(2)(vi), because T.P.'s "complete recantation" meets the criteria for exculpatory evidence that was not available at the time of trial which would have changed the outcome of the trial had it been introduced. *Id.* The Commonwealth filed a Response to Defendant's Petition on February 27, 2019. By Order dated March 11, 2019, this Court scheduled an evidentiary hearing to hear the testimony of T.P. on June 14, 2019, a period of time that would enable arrangements to be made for the transportation of T.P. from the Arizona State Correctional Facility where she was incarcerated to Lebanon County.

This Court subsequently denied a series of motions filed by Defendant's counsel. On March 28, 2019, we denied a Petition to Permit T.P. to testify by telephone. On May 17, 2019, we denied counsel's Petition to Withdraw. On June 11, 2019, we denied Defendant's June 10, 2019 Motion for a Continuance.

On June 14, 2019, both T.P. and the Defendant, with representation by counsel, testified before this Court. T.P. testified that she was 18 on the date of the assault and used drugs only recreationally at that time in her life. (N.T. 6/14/19 at 18, 31, 37) It was after the encounter with the

---

[5] On January 28, 2019, the Defendant also filed a Petition to Stay Conditions of Supervision. That Petition was denied without prejudice by this Court on March 11, 2019.

Defendant that T.P. became a hard core, long term drug abuser of both heroin and methamphetamines, and she now suffers from significant memory issues as a result. (N.T. 6/14/19 at 29) She hears voices and has been diagnosed with drug-induced psychosis. (N.T. 6/14/19 at 30) Consistent with her diagnosed memory problems, T.P. remembers the sexual encounter with the Defendant only vaguely. (N.T. 6/14/19 at 36) Likewise, she only vaguely remembers her testimony at trial regarding the incident. (N.T. 6/14/19 at 9)

T.P. never had counseling in the aftermath of the assault and did not talk about the incident, to anyone, for about 15 years. (N.T. 6/14/19 at 15-16) It was after she had a breakdown that she decided to write the letter she ultimately sent to the District Attorney's Office. (N.T. 6/14/19 at 16) She expressed several reasons for writing the letter. She has newfound religious faith, and she believes she can't expect God to help her fix her life if there is still wrong in it. (N.T. 6/14/19 at 18, 25) She has newfound sobriety. (N.T. 6/14/19 at 18) Also, after serving several sentences on drug charges herself and knowing how bad prison can be, she feels bad she sent the Defendant to prison, stating "I wouldn't send my worst enemy there." (N.T. 6/14/19 at 17) She doesn't "want to be responsible for destroying somebody's life." (N.T. 6/14/19 at 24)

With prompting, T.P. was able to articulate what she believed were several inaccuracies or omissions in her trial testimony. With regard to the statement in her letter that she had lied and the incident was "consensual

11

to start," T.P. indicated that she had not admitted at trial that things "had began (sic) probably consensual," that she and the Defendant had been flirting or "talking about things" before the assault began. (N.T. 6/14/19 at 1, 10) When asked to clarify what she meant by flirting, T.P. said flirting was being "too close. Like talking and stuff." (N.T. 6/14/19 at 11) Upon further questioning by both defense counsel and later by the District Attorney, T.P. indicated that when she referred to things as "probably" starting consensually, that reference indicated verbal flirting. The flirting did not include touching or any of the sexual acts that later occurred. (N.T. 6/14/19 at 12, 29)[6] T.P. expressed guilt with putting herself in the wrong situation. (N.T. 6/14/19 at 12, 29)

In addition to the fact that she had initially flirted with the Defendant, T.P. indicated her report to the police and trial testimony did not include two other facts. First, she did not tell police she initially went to the Defendant's home to mediate a dispute between the Defendant and a mutual friend, Shawn, about a home invasion which the Defendant and Shawn had reportedly perpetrated. (N.T. 6/14/19 at 28, 33) Second, T.P. had not revealed at trial or to police that, following the incident, she had gone into the upstairs of the Defendant's home, in the presence of his mother, to use the phone to call William Panagatos to ask for a ride home. (N.T. 6/14/19 at 19, 28) T.P. explained that while she wanted to get away

---

[6] Even as to this limited characterization, T.P. indicated that "mind you, my brain is a lot jumbled." (N.T. 6/14/19 at 15)

from the Defendant as quickly as possible, it was "a really, really long walk from his place to my house. And I was fucked up in the head, and so I had asked to use the phone." (N.T. 6/14/19 at 19) After calling William Panagatos to pick her up and learning that it would be a bit before he could get there, she immediately left the Defendant's home and began walking home. (N.T. 6/14/19 at 28) T.P. explained that she was scared and wanted to get out of the house and away from the Defendant as fast as possible, because of what he had just done to her. (N.T. 6/14/19 at 32) William Panagatos picked her up several blocks away from the Defendant's home and took her the rest of the way to her home. (N.T. 6/14/19 at 37)

After the District Attorney's Office conceded that the facts supported the §4345(b)(1)(ii) exception to the timeliness requirements of the PCRA, the Defendant briefly testified, on cross, that he has always maintained his innocence on the sexual assault charges, except in his proceedings before the Parole Board. (N.T. 6/14/19 at 44-45) In those proceedings, the Defendant allowed he had lied to the Parole Board and accepted responsibility for the assault in order to meet the eligibility requirements for parole. (N.T. 6/14/19 at 45) As further explanation for his admission to the Parole Board, the Defendant explained: "I am not an unintelligent man and it was required." (N.T. 6/14/19 at 45)

The matter is now ripe for our review and disposition.

## II. DISCUSSION

### A. Jurisdiction

As a threshold consideration, we must consider whether we have jurisdiction to consider the Petition before us. A petition filed pursuant to the PCRA, 42 Pa.C.S. § 9541 *et seq.*, must be filed within one (1) year of the date that the judgment of sentence becomes final. 42 Pa.C.S. §9545(b)(1). A judgment becomes final at the conclusion of direct review or at the expiration of time for seeking the review. §9545(b)(3). "The PCRA's timeliness requirements are jurisdictional in nature and must be strictly construed; courts may not address the merits of the issues raised in a petition if it is not timely filed." *Commonwealth v. Abu-Jamal*, 596 Pa. 219, 941 A.2d 1263, 1267-68 (2004). The Defendant's January 28, 2019 Petition, filed more than 14 years after his conviction became final, is obviously untimely on its face.

The PCRA, however, provides for specific exceptions to the timeliness requirements of §9545(b)(1). To avail himself of one of these exceptions, the Defendant must plead and prove one or more of the following:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>
> (ii) the facts upon which the claim is predicated were unknown to the Defendant and could not have been ascertained by the exercise of due diligence; or

14

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that Court to apply retroactively.

*Id.* Any petition invoking one of the exceptions provided in §9545(b)(1) must be filed within one year of the date the claim could have been presented. 42 Pa.C.S.A. § 9545(b)(2).

The Defendant, who acknowledges the patent untimeliness of his Petition, has specifically pleaded the applicability of the 42 Pa.C.S. § 9545(b)(1)(ii) timeliness exception, and the Commonwealth has conceded the point. We agree that T.P.'s "recantation" was not previously known to Defendant, and, as the result of a court order prohibiting him from contacting the victim, the Defendant could not have obtained her "recantation" by due diligence. Since the Defendant filed the January 28, 2019 Petition claim less than two months after receiving T.P.'s letter from the DA's office, his Petition is well within the one-year time period provided by 42 Pa.C.S.A. § 9545(b)(2). We therefore agree that we have jurisdiction to consider the merits of the claim before us.

*B. Second or Subsequent Petition*

As noted in our summary of the procedural history of the instant action, the PCRA Petition pending before us is the Defendant's third filed at this action number. A second or subsequent petition for post-conviction relief will not be entertained unless a strong *prima facie* showing is offered

15

to demonstrate that a miscarriage of justice may have occurred. *Commonwealth v. Allen,* 557 Pa. 135, 141, 732 A.2d 582, 586 (1999). A *prima facie* showing of entitlement to relief is made only by demonstrating either that the proceedings which resulted in conviction were so unfair that a miscarriage of justice occurred which no civilized society could tolerate, or the defendant's innocence of the crimes for which he was charged. *Commonwealth v. Ali,* 86 A.3d 176-77 (Pa. 2014). Because the instant Petition alleged, with a supporting exhibit, that T.P. would testify in such a manner as to provide a complete recantation of her trial testimony regarding the nonconsensual nature of her sexual encounter with the Defendant, we found that the Defendant's Petition successfully pleaded a *prima facie* case that could potentially establish his innocence for the charges at CP-38-CR-381-2001. As we will now explain, however, the testimony of T.P. at the hearing, both in substance and in reliability, ultimately failed to prove the Defendant's *prima facie* pleading.

### C. After-discovered evidence

To be eligible for relief under the PCRA, a Defendant must plead and prove by a preponderance of the evidence all of the following:

(1) That the Defendant has been convicted of a crime under the laws of this Commonwealth and is at the time relief is granted:

(i) currently serving a sentence of imprisonment, probation or parole for the crime;

(ii) awaiting execution of a sentence of death for the crime;

16

(iii) serving a sentence which must expire before the person may commence serving the disputed sentence; or

(iv) has completed a sentence of imprisonment, probation or parole for the crime and is seeking relief based upon DNA evidence obtained under section 9543.1(d) (relating to post-conviction DNA testing).

(2) That the conviction or sentence resulted from one or more of the following:

(i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(iii) A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused the Defendant to plead guilty and the Defendant is innocent.

(iv) The improper obstruction by government officials of the Defendant's right of appeal where a meritorious appealable issue existed and was properly preserved in the trial court.

(v) Deleted.

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

(vii) The imposition of a sentence greater than the lawful maximum.

(viii) A proceeding in a tribunal without jurisdiction.

(3) That the allegation of error has not been previously litigated or waived.

(4) That the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel.

42 Pa.C.S.A. § 9543(a). The parties do not dispute that the Defendant meets the initial eligibility requirements under § 9543(a)(1). The record establishes that he was convicted under the laws of the Commonwealth and continues to serve his sentence. Additionally, the Defendant has not previously litigated or waived the recantation issue, and his failure to litigate the issue previously was not part of a strategy by previous counsel. Having thus determined that the Defendant has also met the requirements of §9543(a)(3) and (4), we turn our attention to the merits of the Defendant's claim that he is entitled to a new trial pursuant to 42 Pa.C.S.A. §9543(a)(2)(vi): the unavailability at the time of trial of exculpatory evidence -- in this instance the victim's "recantation"-- that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

To obtain relief on a substantive after-discovered-evidence claim[7] under the PCRA, a Defendant must demonstrate: (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict. *See, e.g., Commonwealth v. Washington,* 592 Pa. 698,

---

[7] While there are similarities between the procedural timeliness exception articulated by 42 Pa.C.S. §9545(b)(1)(ii) and a substantive after-discovered evidence claim that can be pursued after jurisdiction is established, the analysis for a substantive after-discovered evidence claim has additional layers that consider the character and quality of the evidence. *Compare* 42 Pa.C.S. §9545(b)(1)(ii) and 42 Pa.C.S. §9543(a)(2)(vi). *See also Com. v. Bennett,* 593 Pa. 382, 930 A.2d 1264 (Pa. Super., 2007)

18

927 A.2d 586 (2007); *Commonwealth v. D'Amato,* 579 Pa. 490, 856 A.2d 806 (2004). The four-part test is conjunctive in nature; if we find the Defendant has failed to satisfy one prong, there is no need for analysis of the remaining prongs of the test. *See Com. v. Pagan,* 950 A.2d 270, 293, 597 Pa. 69, 106 (Pa., 2008)

The Defendant argues that the "recantation" testimony of the victim satisfies, as required, all four prongs of a successful after-discovered evidence claim. We disagree and will focus our analysis on the final prong of the test. Quite simply, we do not believe that the "recantation" testimony of the victim more than 17 years after the incident would compel a different verdict, for two reasons.

First, we are not convinced of the overall reliability of the "recantation" testimony of T.P. Even in ordinary circumstances, recantation testimony is viewed with considerable skepticism.

> 'Recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. *Commonwealth v. Scull,* 200 Pa.Super. 122, 130, 186 A.2d 854 (1962). There is no less reliable form of proof, especially when it involves an admission of perjury. *Commonwealth ex rel. Leeper v. Russell,* 199 Pa.Super. 93, 96, 184 A.2d 149 (1962), *Commonwealth          v.          Sholder,          supra.*'

*Com. v. Mosteller,* 284 A.2d 786, 788, 446 Pa. 83, 89 (Pa. 1971). In the instant case, the specific circumstances and limitations of the witness offering the "recantation" magnify that baseline skepticism considerably. T.P. has admitted, without reservation, that her memory and the testimony based upon that memory are NOT reliable. Her 15-20 years of serious drug

abuse have left her with only vague memories of both the assault itself and her trial testimony regarding it. As she stated at the hearing, "It blurs together." (N.T. 6/14/19 at 35)

Consistent with the serious reservations expressed by T.P. herself as to her ability to recall events accurately--if at all--we observed first-hand T.P.'s memory challenges during the evidentiary hearing. We noted instances in which T.P.'s hearing testimony contradicted her November 2018 letter to the District Attorney.[8] We noted other instances in which her hearing testimony contradicted her own testimony given just minutes before.[9] While we do not doubt the sincerity of T.P.'s motivation to testify truthfully and completely, we have grave doubts, based upon our observations and T.P.'s own admissions during the evidentiary hearing, of her ability to do so. Those doubts prevent us from concluding that the Defendant has met his burden of proving he is entitled to the relief sought in his Petition.

Even if we were convinced T.P. had the ability to accurately recollect events of December 31, 2000, we do not believe that the "recantation" she has offered is of such character and significance that it would have changed

---

[8] T.P.'s letter to the District Attorney indicated she was high on the day of the incident. PCRA Petition January 28, 2019 at ¶7, Exhibit A; N.T. 6/14/19 at 7, Exhibit 1. At the evidentiary hearing, she indicated she was not high or at least didn't think she was. (N.T. 6/14/19 at 16)

[9] At the evidentiary hearing, T.P. at one point testified that a "mutual friend" had picked her up and taken her and the Defendant to the Defendant's home. (N.T. 6/14/19 at 18) Minutes later she testified that she didn't remember if someone drove her there." (N.T. 6/14/19 at 20)

the jury's verdict in 2002 and therefore, today, warrants our granting of a new trial. We note initially that two of the three new "facts" to which T.P. testified are not recantations at all. They are not contradictions of T.P.'s trial testimony, but rather additions to it. For example, the fact that T.P. went to the Defendant's home to mediate a dispute between the Defendant and their mutual friend, Shawn, about a burglary or home invasion which Shawn and the Defendant had allegedly perpetrated would likely not have been admissible due to its prejudicial nature. Moreover, we are hard-pressed to imagine—and the Defendant has not argued-- how this fact would bolster the Defendant's contention that T.P. consented to sexual activity with him.

Likewise, with regard to T.P.'s admission that she had some initial attraction to the Defendant and the two of them had engaged in verbal flirting before the Defendant restrained T.P. and forced himself upon her over her repeatedly stated objection, we note that at trial T.P. was not asked and did not deny the existence of flirting or initial attraction between the parties. T.P.'s desire to now reveal that that there was some initial flirtatious banter between the parties is a minor addition[10] to trial testimony, not a repudiation or revocation of it. Therefore, it is not a recantation. Additionally, we wish to stress, emphatically, that such banter would not

---

[10] The Defendant at trial likewise did not testify regarding significant flirting or attraction between the parties. He did testify that there was some "sexual talk." He commented on T.P.'s promiscuity and indicated that they better "get busy" in the basement. (N.T. April 3, 2002 at 115, 133-144, 157) T.P. was not asked to confirm or deny any of these details at trial.

have established T.P.'s ongoing and irrevocable consent to what happened next, particularly in light of her repeated protestations once the Defendant initiated and forcibly continued physical sexual contact.

As to the third inaccuracy identified by T.P. at the hearing—the fact that she went upstairs after the assault and called William Panagatos for a ride home – that testimony, which was not included in T.P.'s letter to the District Attorney, is a contradiction to and therefore could be considered a recantation of T.P.'s trial testimony. However, we do not believe this narrow recantation warrants relief.

First, in addition to our general concerns regarding the credibility and accuracy of the testimony T.P. was able to offer at the evidentiary hearing, we are specifically concerned about T.P.'s hearing testimony with regard to the call to William Panagatos for a ride home on the day of the assault, as it is particularly muddled and suspect. At trial T.P. testified—consistent with the Defendant's own trial testimony—that on the day of the assault she had received a ride TO the Defendant's house from William Panagatos. (N.T. 4/3/2002 at 28) However, following the assault, she did not --in contradiction to the Defendant's assertion-- use the Defendant's upstairs phone in the presence of the Defendant's mother to call William Panagatos for a ride home. Rather, she left immediately and ran home. (N.T. 4/3/2002 at 45; 54) About two weeks prior to the date of the assault, however, T.P. had been in the Defendant's home and met his mother along with several other people, who had been dropped off by an unidentified female driver.

22

(N.T. 4/3/2002 at 229) T.P. testified it was that day—not the day of the assault--that William Panagatos was called and provided T.P. and others a ride home. (N.T. 4/3/2002 at 229)

At the evidentiary hearing, in contradiction to her testimony at trial, T.P. indicated that she went upstairs after the assault to make a phone call to William Panagatos to get a ride home. We find it important to note that, in that same testimony, T.P. also indicated that, on the day of the assault, she had NOT been driven TO the Defendant's home by William Panagatos. (N.T. 6/14/19 at 20) Since at trial both the Defendant and T.P. agreed that William Panagatos drove T.P. to the Defendant's home on the day of the assault, this Court is very concerned that T.P.'s "recantation testimony" regarding the ride home from William Panagatos is not an actual repudiation of her trial testimony, but rather a manifestation of, in T.P.'s own words, her brain "being a lot jumbled." Our assessment of T.P.'s testimony leads us to believe that it is very possible that she can no longer differentiate between the day of the assault in the home of the Defendant and a day several weeks prior to the incident, when she was driven, by William Panagatos, from the Defendant's home to her residence. In essence, T.P.'s testimony on this issue seems to be a cognitive coin toss, and we are not satisfied that her testimony at the evidentiary hearing is an accurate account of what happened on December 31, 2000.

Second, we are not persuaded that such testimony, even if credible, would have compelled a different verdict at trial. While Defendant's trial

23

counsel likely would have argued that T.P.'s failure to immediately flee from the premises was consistent with the sexual encounter having been consensual, T.P. explained at the hearing that she lived a significant distance away and needed a ride to get home. Further, she indicated that, since William Panagatos could not arrive quickly, she immediately left and was picked up some distance away, reiterating that she was afraid of the Defendant and wanted to get away from him as quickly as possible. Given this context, we do not believe T.P.'s new statement that she used the Defendant's phone before fleeing after the assault would compel a different verdict.

Moreover, testimony about whether T.P. used the phone to try to get a ride to her home some distance away prior to fleeing the premises on foot is insignificant when considered in light of the complete record of the case. For those who will inevitably review this case on appeal, we wish to note specifically what T.P., even in her impaired state, could NOT be led or persuaded to say, either in her letter or at the evidentiary hearing. Despite the PCRA Petition's claim that T.P. has completely recanted her testimony regarding the nonconsensual nature of the sexual encounter on December 31, 2000, at no time did T.P. say the sexual acts performed upon her by the Defendant were consensual or that he was innocent. Indeed, in her letter, while lamenting that she had not admitted her original attraction to the Defendant or the consensual start (explained later as verbal flirting) to the encounter in her testimony at trial, T.P. wrote "I didn't (sic) lie in the acts

24

of what happened." She reitierated that statement at the evidentiary hearing, stating "I don't think I lied when I was on the stand [at trial]." (N.T. 6/14/19 at 23)

Second, aside from T.P.'s revelations about initial flirtatious behavior between the parties, T.P.'s evidentiary hearing testimony, rambling and imprecise as it was, consistently acknowledged the unwanted nature of the Defendant's sexual contact. Despite initial interest in the Defendant and flirtatious banter with him, T.P. indicated she had "changed her mind" and "tried to back out and get away." (N.T. 6/14/19 at 22,33) She was scared during the encounter. (N.T. 6/14/19 at 21) She wanted it to stop, and she told him to stop. (N.T. 6/14/19 at 35, 38) Nowadays, she testified, she would have "cussed him out" and kneed him in the groin, and she is angry at herself for not fighting back more. (N.T. 6/14/19 at 31) We do not believe those are the words of someone who consented to the sexual acts perpetrated on her.

That the sexual encounter between the parties was nonconsensual is supported by the record as a whole, in facts that corroborate T.P.'s claims of nonconsensual sex and facts that discredit the Defendant's claim of consent. Our review of the record has included consideration of police testimony regarding the emotional state of T.P. immediately after the incident, the consistent nature of her accounts to investigators, and the corroborating physical bruising on her knees. We have taken special note of the fact that, shortly after the sexual assault, T.P. cut her hair, indicating

25

she never wanted anyone to pull her hair again like the Defendant had during the assault. (N.T. 4/3/2002 at 40)

We have considered, too, the Defendant's testimony, both at trial and at the evidentiary hearing. We have considered the credibility of his initial denial of all sexual contact with the Defendant until confronted with the possibility of physical evidence to the contrary and then his absurd explanation offered at trial for the inconsistency of those statements.[11]

All of these considerations have been dutifully weighed by the Court, and based upon them, we cannot conclude the additional or different testimony offered by T.P. at the evidentiary hearing would result in a different outcome of the Defendant's trial.


## IV.   CONCLUSION

To grant relief in this case, we must be satisfied that the "recantation' of T.P. is credible. We are not. Moreover, even if we found the new or different information offered by T.P. at the evidentiary hearing to be reliable, we would find that it is not significant enough, in the context of the

---

[11] At trial, we did not find credible the Defendant's explanation that the police had initially asked him if he had slept with T.P. and he had answered in the negative because, while he and T.P. had had sex, "sleeping is when you're lying down with your eyes closed." (N.T. 4/3/02 at 179) The Defendant's trial testimony included other incredulous claims. In one instance, the Defendant testified that on the day of the incident, after the phone call to William Panagatos and just prior to leaving to go home, T.P. gave the Defendant a hug and said she'd contact him a little later that day. (N.T. 4/3/02 at 169) Given T.P.'s prompt report to police and their objective testimony regarding her emotional state at the time of their response, the Defendant's whitewashing of the events of December 31, 2000 was not remotely believable, and it, along with his inconsistent statements to police, severely damaged his credibility with the jury and with this jurist.

complete record of the case and in relation to central issue of the case, which is consent, to compel a different verdict.     T.P. has not said the acts perpetrated by the Defendant upon her were consensual. Even in her impaired mental state, she has said the opposite, that they were nonconsensual. Her actions during and after the incident were consistent with that claim.

We appreciate and respect T.P.'s efforts to clear her conscience. We hope those efforts have their desired effect in her life. She has done her job, and now we will do ours.

We will enter an appropriate Order.