J-A12039-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ERIC EUGENE SMALL | : | |
| | : | |
| Appellant | : | No. 983 MDA 2020 |

Appeal from the PCRA Order Entered July 2, 2020
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0001458-2011

BEFORE: LAZARUS, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    **FILED JULY 20, 2021**

Eric Eugene Small ("Small") appeals from the Order dismissing his Petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1] We affirm.

Our Supreme Court, in its Opinion, previously set forth the factual background underlying this appeal, which we adopt as if set forth herein. ***See Commonwealth v. Small***, 189 A.3d 961, 963-67 (Pa. 2018). In summary, Small was convicted of first-degree murder and carrying a firearm without a license[2] in connection with the shooting death of William Price ("Price") in the early morning hours of March 7, 2011, outside of Club Egypt, a nightclub in Harrisburg, Dauphin County.

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

[2] 18 Pa.C.S.A. §§ 2502(a), 6106(a)(1).

The primary issue at trial was the identity of the shooter, as no witnesses had directly observed the shooting. Kenosha Tyson ("Tyson"), who was the mother of the children of Small's friend Pedro Espada ("Espada"), testified that Price had assaulted her in a different nightclub a few days before the murder. The Commonwealth presented numerous witnesses, including friends of Small and Espada, and friends of Price. All of these witnesses testified that they had observed Small walking away from Club Egypt with his arm around Price, heard a gunshot shortly after, and then saw Price laying on the ground. One witness, Ali Williams, a friend of Small and Espada, testified that he saw Small with something in his left hand as Small walked with his right arm around Price. The Commonwealth also presented testimony from two Harrisburg police officers, who investigated the shooting, and two jailhouse witnesses, who testified that Small had made incriminating statements to each of them when they shared a cell with Small. Forensic pathologist Wayne Ross, M.D. ("Dr. Ross"), testified that Price died due to a contact gunshot wound to the head, and opined that the barrel of the gun had to have been pressed into Price's face when he was shot.

Small's theory at trial was that Espada shot Price. Small presented an alternative motive, *i.e.*, that Espada killed Price because he had assaulted Tyson, who gave birth to Espada's child just a few weeks before the assault. Further, Small pointed to multiple witnesses' testimony that Espada was

walking behind Small and Price just before the shooting, and could have been close enough to Price to cause the contact gunshot wounds.

Further, Small presented evidence indicating that Espada had confessed to the murder. Lisa Small, Small's sister, testified that she had learned from Jasmine Spriggs, Espada's then-girlfriend, that Espada admitted to shooting Price. Deleon Dotson ("Dotson") testified that Espada had confessed to shooting Price from three to five feet away, and that Small had taken the blame for the murder, even though Espada had shot Price.

At the conclusion of trial, a jury convicted Small of first-degree murder, and carrying a firearm without a license. On October 1, 2012, the trial court imposed an aggregate sentence of life in prison. This Court affirmed Small's judgment of sentence, and the Pennsylvania Supreme Court denied his Petition for allowance of appeal. **See Commonwealth v. Small**, 87 A.3d 879 (Pa. Super. 2013) (unpublished memorandum), **appeal denied**, 94 A.3d 1009 (Pa. 2014).

In September 2014, Small filed a timely PCRA Petition and was appointed counsel, who filed and an Amended PCRA Petition in March 2015. In the Amended Petition, Small presented after-discovered evidence through an Affidavit by Tyson, wherein she averred that Espada had confessed to shooting Price hours after the murder, and that Tyson had withheld this information because neighborhood residents were threatening witnesses, and

because she was concerned that her involvement in the case would jeopardize her custody proceedings.

Following a May 2015 evidentiary hearing, on January 19, 2016, the PCRA court granted Small a new trial, based upon its finding that Tyson's testimony constituted new evidence which could have changed the outcome of Small's trial. The Commonwealth appealed, and this Court reversed the PCRA court's grant of a new trial. *See Commonwealth v. Small*, 169 A.3d 1199 (Pa. Super. 2017) (unpublished memorandum). Thereafter, our Supreme Court vacated this Court's Order, and remanded to the PCRA court for an assessment of the credibility of Tyson's testimony. *See Small*, 189 A.3d at 979.

Following our Supreme Court's remand, the PCRA court determined that Tyson's testimony would not have led the jury to a different result. PCRA Court Opinion, 6/30/20, at 14-24. Thereafter, Small filed a timely Notice of Appeal, and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Small raises the following issue for our review:

Whether the PCRA court erred in finding that Tyson's new testimony is not of a higher grade or character than that presented at trial and in finding that a different result would not occur if a new trial was granted, when Tyson's testimony was credible and the trial testimony indicated that Espada was close enough to cause the type of wound testified to by Dr. Ross?

Brief for Appellant at 6 (title and numbering omitted).

Small argues that the PCRA court abused its discretion in failing to consider testimony which placed Espada in close enough proximity to Price to cause a contact gunshot wound. *Id.* at 12. Small points to testimony indicating that Espada was a few feet behind Small and Price moments before the shooting and approaching them at a quicker pace. *Id.* at 12-13. Small also directs our attention to testimony indicating that two of Price's friends initially gave chase to Espada, not Small, which, Small asserts, was because Espada was the shooter. *Id.* Small asserts that a jury would not have needed to discount Dr. Ross's testimony to conclude that Espada was the shooter, as Espada was located close enough to Small and Price that he could have caused a contact gunshot wound. *Id.* at 14-15. Finally, Small brings our attention to testimony that Espada possessed a firearm shortly after the shooting, as Small asserts that Espada fired shots in the direction of Price's friends as they pursued him. *Id.* at 15. For these reasons, Small argues, Tyson's new evidence holds more weight, and Small is entitled to a new trial. *Id.*

> We review an order dismissing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. We grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Further, where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review is plenary.

*Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa. Super. 2012) (citations omitted).

> Under the PCRA,
>
> [w]here a petition is otherwise timely, to prevail on an after-discovered evidence claim for relief under [42 Pa.C.S.A. §] 9543(a)(2)(vi), a petitioner must prove that (1) the exculpatory evidence has been discovered after trial and could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict. *Commonwealth v. D'Amato*, 856 A.2d 806, 823 (Pa. 2004); *see* [*Commonwealth v.*] *Cox*, 146 A.3d [221,] 227-28 [(Pa. Super. 2016)] ([stating that] "[o]nce jurisdiction has been properly invoked, ... the relevant inquiry becomes whether the claim is cognizable under [Section 9543] of the PCRA.").

*Commonwealth v. Burton*, 158 A.3d 618, 629 (Pa. 2017) (citation omitted).

The factual findings of a post-conviction court, which hears evidence and passes on the credibility of witnesses, should be given deference. *See Commonwealth v. Spotz*, 84 A.3d 294, 319 (Pa. 2014). Our Supreme Court has acknowledged that

> [r]ecantation testimony is extremely unreliable. When the recantation involves an admission of perjury, it is the least reliable form of proof. The [PCRA] court has the responsibility of judging the credibility of the recantation. Unless the [PCRA] court is satisfied that the recantation is true, it should deny a new trial. An appellate court may not disturb the [PCRA] court's determination absent a clear abuse of discretion.

*Commonwealth v. Henry*, 706 A.2d 313, 321 (Pa. 1997) (internal citations omitted).

In its Opinion, the PCRA court thoroughly addressed Small's claim, and concluded that it lacks merit. *See* PCRA Court Opinion, 6/30/20, at 18, 20-

24. Specifically, the PCRA court determined that Tyson's testimony was not credible, and that her testimony would not have compelled a different verdict if it had been presented at trial. **Id.** The PCRA's findings are supported in the record, and its legal conclusion is sound. **See id.** We therefore affirm on the basis of the PCRA court's Opinion with regard to this claim. **See id.**

Additionally, we observe the following. Regarding Small's argument that the PCRA court failed to properly consider forensic evidence, which, he argues, could also support Espada as the shooter, we note that the identity of the shooter—including the potential for Espada to have fired the fatal shot— was the key point of contention at trial. Multiple witnesses testified as to the positioning of both Espada and Small at the time Price was shot. Dr. Ross also testified as to the nature of Price's gunshot wound, and that the shooter would have had to be close enough to Price to press the gun into his face when the shot was fired. Additionally, we observe that at no point during the PCRA proceedings did Tyson, or any other witness, bring forth any additional evidence regarding the positioning of Small, Espada, and Price when Price was shot. **See Small**, 189 A.3d at 963-67 (wherein our Supreme Court details the testimony presented at Small's trial).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>07/20/2021</u>

COMMONWEALTH OF PENNSYLVANIA      : IN THE COURT OF COMMON PLEAS

                                 : DAUPHIN COUNTY, PENNSYLVANIA

                              :

                V.                     :

                              :

ERIC SMALL                            : 1458 CR 2011

## MEMORANDUM OPINION ON
## REMAND FROM SUPREME COURT

"...There's a guy starting to realize that his eternal fate has turned its back on him. It's two A.M. ..."[1]

Defendant Eric Small was convicted by a jury of criminal homicide and firearms not be carried without a license following a trial held on August 6, 2012 through August 8, 2012. The conviction stemmed from William (Will) Price being fatally shot in the head after walking out of Club Egypt in Harrisburg. On October 1, 2012, Defendant was sentenced to life imprisonment for the homicide conviction, and three (3) to seven (7) years of imprisonment for the firearms conviction, to run concurrent with the life sentence.

Defendant filed a notice of appeal, and his judgment of sentence was affirmed by the Superior Court on October 9, 2013. On September 2, 2014, Defendant filed a timely *pro se* PCRA petition. Christopher Dreisbach, Esq., was appointed as Defendant's counsel. On March 23, 2015, Attorney Dreisbach filed a PCRA petition on behalf of Defendant, alleging ineffective

---

[1] *Twilight Zone, (1982) written by George Kooymans, Golden Earring; 21/Polygram Records*

1



37-24
SCANNED

assistance of trial counsel and newly found evidence that would warrant a new trial.[2] A hearing was held on the petition. After careful consideration of the request for PCRA relief and the testimony set forth at the PCRA hearing, this Court, in an Order filed simultaneously with this opinion, granted PCRA relief in the form of a new trial based upon newly discovered evidence.[3]

Commonwealth appealed and Superior Court reversed and remanded by Order of April 21, 2017.[4] *Certiori* was granted and by Order and Opinion of the Pennsylvania Supreme Court dated July 18, 2018, vacated Superior Court's Order and remanded to the trial court to reassess the PCRA findings consistent with its clarification and proper analysis of the "merely corroborative or cumulative evidence" standard in after acquired evidence. After hearing and argument thereon, this Opinion is entered.

In the early morning hours of March 7, 2011, the victim, William (Will) Price, was fatally shot in the head after walking out of Club Egypt in Harrisburg, Pennsylvania

---

[2] On April 28, 2015, Attorney Dreisbach filed a Supplement to the March 23rd PCRA petition (incorporating the original petition) and adding an averment of additional newly found evidence. Specifically, an additional person had come forward with information. However, Attorney Dreisbach later decided against pursuing testimony from this particular witness. *See* PCRA Hearing, June 29, 2015, Notes of Testimony, p 3.

[3] Defendant's claims of ineffective assistance of counsel as a basis nor a new trial were addressed by this Court, and were deemed without merit.

[4] *Commonwealth v. Eric Small*, 245 MDA 16, curlish Opinion drafted by assigned retired senior trial court Judge Platt defies civility amongst fellow jurists. He clearly did not understand the basis for my analysis. I attribute that to my inability to properly draft an opinion that made clear why my shift in analysis existed.

In weighing the appropriate manner to assess the new testimony, this Court was trying to project the direction of the appellate court's direction in light of various cases which required the proper assessing of facts and their import to be by the jury and not a trial judge as gate keeper.

Whether it be in the area of Products Liability or relatively clear and easily established elements of a crime (such as person prohibited by law to possess a firearm) to other instances affecting gradation, I perceived a direction to step away from my making of a credibility decision and opted to review as if a jury could, if they wished assess the testimony with a greater weight and arrive at a different result. I was clearly wrong, hence the remand. Maybe that can explain the reason this Court's direct appeal opinion differs greatly in tenor than its PCRA opinion granting a new trial.

2

Police officers were called to investigate the shooting, which occurred in the area of Second and State Streets in Harrisburg, at just after 2:00 a.m. [N.T., Vol. 2, 8-7-12, p. 7]. It was snowing on March 7th, and some of the officers called to the scene that morning followed a trail of footprints found near the victim's body. The prints eventually led the officers to apartment buildings in the 2100 Block of North 5th Street. [N.T., Vol. 2, 8-7-12, pp. 38-84]. The officers proceeded to knock on doors and, while they were doing so, Defendant came out of Apartment 2. [N.T., Vol. 2, 8-7-12, p. 85]. Detective John O'Connor testified that, during his conversation with Defendant, Defendant appeared nervous and jumpy. [N.T., Vol. 2, 8-7-12, p. 86].

The testimony of the events leading up to Will Price's shooting reveals that several friends/acquaintances were at Club Egypt until closing time on the night in question, and exited the club at about the same time. After exiting the club, Defendant was seen with his arm wrapped around Will Price while the two men were walking, heading towards Second and State Streets. [N.T., Vol. 2, 8-7-12, pp. 156, 174, 175]. Lisa Small, Defendant's sister, observed this and, a short time later, heard a gunshot. Her testimony at trial was that she then saw the victim on the ground, Defendant running, and then observed a man named Pedro Espada fire two gunshots shortly after the initial gun shot went off. [N.T., Vol. 2, 8-7-12 pp. 172, 174, 189-191].

Another witness, Shamar Evans, a cousin of the victim, also testified that he saw Will Price walking away from Club Egypt with an individual fitting the general description of Defendant (as far as the clothing he was wearing on the evening in question), and that such individual had his arm around Will Price's shoulder while walking towards Second and State Streets. [N.T., Vol. 2, 8-7-12, pp. 205-208]. Moments later, Evans turned to get into his car, sat

3

down, looked back over at Will Price, and saw him falling on his back. [N.T., Vol. 2, 8-7-12, p. 208]. When he reached Price and saw that his eye was swollen/bulging, he started following (on foot) the person who had been standing right next to Price. [N.T., Vol. 2, 8-7-12, pp. 209-213]. Evans ran down State Street, saw the man run into an alley, then heard additional gun shots. He testified that he then slowed his pace because the individual had a gun. [N.T., Vol. 2, 8-7-12, pp. 213-215]. When Evans stopped back to check on Price, the police were already on the scene. [N.T., Vol. 2, 8-7-12, p. 215].

Witness Andre Knight was also at Club Egypt on March 7th, and testified that he saw Defendant talking to Price, with his arm around him. As he crossed Second Street, Knight heard a gunshot and then saw Defendant and others running down State Street. [N.T., Vol. 3, 8-8-12, pp. 49-59]. Knight went to Lisa Small's apartment after the incident, and Defendant showed up at Lisa's apartment at around the same time. [N.T., Vol. 3, 8-8-12, pp. 60-61]. Knight testified that he heard Defendant said that "cuz got what he deserved," and "we did what we had to do." [N.T., Vol. 3, 8-8-12, pp. 62-63].

Ali Williams, Lisa Small's boyfriend, was also a part of the group at Club Egypt during the time frame in question. Williams testified that he noticed Defendant and Pedro Espada talking, during which they "kept looking at Will." [N.T., Vol. 3, 8-8-12, p. 85]. When he asked them what was going on, Defendant and Espada told her not to worry about it. [N.T., Vol. 3, 8-8-12, p. 85]. After exiting the club, Williams testified that while he was crossing the street on the way to Second and State Streets, he heard a gunshot. When he looked up, he saw Pedro Espada in the middle of State Street, and observed Defendant standing over Will Price, while Price was

4

lying on the ground. [N.T., Vol., 3, 8-8-12, p. 85]. When questioned further, Williams stated that before hearing the gunshot, and before he saw Defendant standing over Price, Defendant had his right arm around Price, and had his left arm to the side, "and you could tell he (Defendant) had something...in his left hand." [N.T., Vol. 3, 8-8-12, p. 88].

Two of Defendant's cellmates also testified at trial. Kenneth Hibbert stated that Defendant told him different scenarios of what happened: (1) that he was walking with Price with his arm around him, and the gun went off; (2) he was walking with Price, parted from him for a second, was a few feet away from him when the gun went off and Price hit the ground; (3) and that Defendant "snapped" one day and said to Hibbert that he "killed William Price for Pedro and turned [his] face into hamburger meat." [N.T., Vol. 4, 8-9-12, pp. 11-12]. According to Hibbert, when Defendant found out that he had made statements against him, he told Hibbert that he would kill him too, like he killed William Price. [N.T., Vol. 4, 8-9-12, p. 13].

Another cellmate, Jeffrey Reid, testified that, according to Defendant, the murder of William Price came about because, "William Price had problems with his sister and his boy Pedro Espada,....and he said he shot him in the head." [N.T., Vol. 4, 8-9-12, p. 26-27].

With regard to what Defendant has referenced in his issue on appeal, the record reflects conflicts among some of the witnesses' testimony. During Lisa Small's testimony, she contradicted earlier statements given to detectives when she claimed that she saw Pedro Espada fire off the two gunshots after the initial gunshot went off. [N.T., Vol. 2, 8-7-12, pp. 177, 178, 189-190]. Additionally, Detective Ryan Neal testified regarding Lisa Small's second statement to him during an interview. Detective Neal had initially interviewed Lisa Small on

5

March 8, 2011. The second interview/statement was taken on March 15, 2011. In the second statement, Lisa referred to information that she had heard from Jasmine Spriggs. [N.T., Vol. 3, 8-8-12, pp. 9-11]. Specifically, Lisa asserted that Jasmine Spriggs told her that Pedro Espada was the shooter in the case. [N.T., Vol. 3, 8-8-12, p. 11].

Another witness, Deleon Dotson, also testified regarding a statement he had given to Detective Donald Heffner. Dotson stated that Pedro told him that he (Pedro) shot Will, and Dotson relayed this information to Detective Heffner. [N.T., Vol. 3, 8-8-12, p. 134]. Dotson testified that "Dro (Pedro) said he walked up beside Eric, walked around his left side, and he said he just pointed the gun and shot....He said he was about 3 to 5 feet away." [N.T., Vol. 3, 8-8-12, p. 135]. On redirect examination, Dotson also testified that he thought Pedro was "puffing," meaning bragging in order to attain street credibility. [N.T., Vol. 3, 8-8-12, p. 136].

The jury weighed all such testimony and returned a verdict of guilty thereon; sentence imposed; appeal taken; judgement affirmed.

"Well the night weighs heavy on his guilty mind"[5]

On September 2, 2014, appellant filed a timely petition pursuant to the Post-Conviction Relief Act ("PCRA") 42 Pa.C.S. §§9541-9546. The PCRA court[6] appointed counsel, who subsequently interviewed Tyson as part of his investigation. On March 12, 2015, Tyson executed the following notarized statement.

---

[5] *Twilight Zone,* (1982) written by George Kooymans, Golden Earring; 21/Polygram Records
[6] The Honorable Scott Arthur Evans of the Court of Common Pleas of Dauphin County presided over both appellant's trial and his post-conviction proceedings.

6

I, Kenosha Tyson, withheld certain personal knowledge from the Harrisburg Police Department when questioned regarding the murder of William Price, Jr. Further, I continued to withhold that personal knowledge while testifying at [defendant]'s jury trial. Upon reflection, I believe I must make the proper authorities aware of what occurred immediately following the murder.

Within hours of the murder, the father of my children, Pedro Espada, specifically admitted to me "I shot him" referring to Mr. Price, Jr.

I was not forthright with this information because I feared any connection between me and the murder would have detrimentally affected Children and Youth proceedings regarding the custody of my children. Further, numerous threats were being made around my neighborhood immediately following the murder pertaining to anyone providing information to police.

I am willing to testify to the above facts during any future court proceedings, including a new trial, should [defendant] receive that opportunity.

I have neither been forced nor threatened in any way to make this statement. Further, no promises have been made to me to make this statement. I make this statement entirely of my own freewill.

Affidavit of Fact, Reproduced Record ("R.R.") at 270 (a).

Armed with Tyson's new affidavit, counsel filed an amended PCRA petition on March 23, 2015, alleging appellant was entitled to relief under 42 Pa.C.S. §9543(a)(2)(vi) (permitting relief where the petitioner proves by a preponderance of the evidence that the conviction or sentence resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced").[7]

---

[7] The amended petition also presented a claim of ineffective assistance of trial counsel, which the PCRA court rejected. As defendant did not appeal that ruling, we do not discuss it further.

7

The PCRA court held an evidentiary hearing on May 12, 2015. At the hearing, Tyson testified that, within twenty-four hours of the murder, Espada called her and stated he was coming to her apartment. N.T. 5/12/15, 56. When Espada arrived, Tyson noticed he "was looking a hot mess. . . . He cut his hair and he just looked like he was up all night crying and stuff and he was like shaken up." *Id.*[8] She asked him what was wrong. *Id.* After stating he had "messed up[,]" Espada proceeded to tell Tyson he killed Price. *Id. At 56-57.* He told her he did it because of Price's prior assault on Tyson. *Id.* At 57-58. He also stated everybody was "in his ear the whole night talking about he should get him." *Id.* At 57.

According to Tyson she did not tell police about Espada's confession when they interviewed her after the murder because her "two oldest kids were in foster care and [she] was getting a lot of threats on Facebook." *Id.* at 59. She claimed: [T]he police were threatening me that they would make sure my kids would stay in foster case and when I would have the baby I was pregnant with, they would take her and lock me up and make sure I lose my apartment, and stuff like that." *Id.*[9] As for her sudden willingness to come forward, Tyson explained she had "been praying a lot" and wanted to remove the stress she bore from withholding this information. *Id.* at 60.

---

[8] We note Tyson's testimony regarding when she spoke to Espada was internally inconsistent. While she unequivocally stated in her affidavit that she saw Espada "[w]ithin hours of the murder," R.R. at 270(a), and she testified to that effect when prompted by defense counsel at the evidentiary hearing, her testimony seemingly differed on cross-examination. Notably, when the prosecutor asked Tyson if she had cut Espada's hair, she responded: "I didn't give him a haircut. When he came to my house the day he told me he shot [Price], that was like a week later when his hair was already cut." N.T. 5/12/15, 67 (emphasis added).

[9] We note this statement, too, is inconsistent with other evidence. Specifically, Tyson testified at trial that she had already given birth approximately two weeks before the murder. N.T. 8/7/12, 132-32

8

On cross-examination the prosecutor challenged Tyson with the signed statement she gave to police on March 15, 2011. In that statement, she told Detective Heffner she spoke with Espada at some point after Price was killed, but denied they talked about murder. *Id.* at 63. Although Tyson admitted to signing the March 2011 statement, she claimed at the evidentiary hearing that she did so without reading it; she also claimed the detective "wrote it very different from what [she] said." *Id. at 63-64.* When asked why she failed to report the threats made against her, she stated she did let police know about them, but asserted the "police were some of the people that were threatening [her,]" and they told her there was nothing they could do. *Id.* at 65,68.

"Where am I go now that I've gone too far?"[10]

The Pennsylvania Supreme Court granted allowance of appeal to consider the following issue: "Whether the Superior Court erred in reversing the PCRA court's grant of a new trial based on after-discovered evidence by finding that Tyson's testimony was merely cumulative and corroborative of the exculpatory evidence presented at [defendant]'s trial?"

At the outset I acknowledge that the observations of the Supreme Court and comments by appellant are correct. That is precisely why I phrased my PCRA opinion to place forth, that "If credited by a jury, Ms. Tyson's statement and testimony regarding Mr. Espada's admission to her would likely result in a different verdict."

---

[10] *Twilight Zone* (1982) written by George Kooymans, Golden Earring; 21/Polygram Records

9

This Court did not make its own assessment of the credibility of Tyson's PCRA affidavit and testimony. We did in fact, choose to relinquish that determination to a jury and that, in essence, was the basis of the granting of a new trial to be able to effectuate same. By doing so, we changed the manner in which precedential newly acquired evidence was assessed. This approach was not meant as an attempt by this Court to set its own standard as opposed to Pennsylvania precedent. Rather, it was a misadventure or mistaken postulation on my part as to the direction, I, personally, thought the metamorphosis would be taking.

Cases ranging from *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 186 L.Ed. 2d 314 (2013), to *Commonwealth v. Raymond*, PICS Case No. 20 -0579, ___ Pa. Super. ___ (May 27, 2020), to *Commonwealth v. Tukhih*, 149 A3d 881, ___ Pa. Super. ___ (2016) and *Commonwealth v. Scott*, 146 A3d 775, ___ P. Super. ___ (2016) seemed to signal a direction that all fact finding analysis should be the province solely of the jury.

My analysis was trying to assess whether a jury, as fact finder, could come to a different assessment of the proposed new testimony projecting as to a possible finding based on their assigned weight. I note that our final jury charge references that you are to give all the testimony whatever weight you think it deserves.

Well, it is abundantly clear that my attempt to project the future direction of appellate jurisprudence was in error. Especially given Superior Court's curt rebukes. My hypothesis was incorrect.

10

The Pennsylvania Supreme Court, then, wisely and helpfully gave further clarification to the means in reestablishing the precedential review to be taken. In doing so, they cited caselaw from Georgia.

> [T]he true test as to whether evidence is cumulative depends not only on whether it tends to establish the same fact, but it may depend on whether the new evidence is of the same or different grade. It is only when newly discovered evidence either relates to a particular material issue concerning which no witness has previously testified, or is of a higher and different grade from that previously had on the same material point, that it will ordinarily be taken outside the definition of cumulative evidence.

*Brown v. State*, 450 S.E.2d 821, 824 (Ga. 1994) (citation omitted).

To elaborate on this language, the Supreme Court stated:

> We view the definitions of cumulative evidence employed by our sister states to be consistent with our decision in *Flanagan,* and we reaffirm that after-discovered evidence is merely corroborative or cumulative – and thus not sufficient to support the grant of a new trial – if it is of the same character and to the same material point as evidence already adduced at trial. It is clear the terms "of the same character" and "to the same point" refer to distinct qualities of evidence; to be "merely corroborative or cumulative," newly discovered evidence must tend to prove material facts that were already in evidence at trial, and also be of the same grade or character of evidence as that produced at the

11

trial to prove those material facts. See *Brown,* 450 S.E.2d at 824. If the new evidence is of a different and "higher" grade or character, though upon the same point, or of the same grade or character on a different point, it is not "merely" corroborative or cumulative, and may support the grant of a new trial based on after-discovered evidence.

Later in their Opinion they further noted:

Collectively, these cases confirm this Court has never foreclosed – and has actually embraced – the notion that new evidence tending to prove a material fact was in evidence at trial is not always "merely" corroborative or cumulative, so long as it is of a higher and different grade or character. Moreover, our cases support a salutary goal of the after-discovered evidence from a credible source which may lead to a true and proper judgment. See, e.g., *Spencer v. State,* 153 S.W. 858, 860 (Tex. Crim. App. 1913) ("[T]he reason for the rule forbidding a new trial for the purpose of admitting cumulative testimony is that public policy. . . seeks to limit continued litigation, [but it] should never be applied where the newly discovered testimony may be of that cogency and force where it might probably show that an innocent man may probably be cause to suffer for a crime he did not commit.") Accordingly, we now clarify that evidence which is corroborative or cumulative, but not "merely" so – that is, the new evidence is of a higher grade or character than what was previously presented on a material

12

issue – may properly be use to support the grant of a new trial. The footnote that follows is instructive.[11]

The review of Tyson's testimony is not just what she says, but must be first acknowledged who she is. Giving her rendition, as best as she now recalls, of Espada's late night confession to her as one he has sought out in his emotional state. She is the mother of his children. Presumably, one he would have a trusting relationship. The defendant argues Tyson's testimony recounting Espada's confession is of a higher and different grade than the confession testified to by Dotson and Detective Neal. Further, by stressing that Tyson's relationship to Espada makes her testimony "more believable," defendant implies that Tyson herself is a witness of a higher and different quality that the other witnesses. Given her station, we agree. But as the Supreme Court noted,

> Ordinarily, appellant's [defendant's] position would be compelling, but the nature of Tyson's testimony complicates the matter.
>
> As the PCRA court appreciated, this Court has repeatedly "acknowledged the limitations inherent in recantation testimony, which has been characterized as 'extremely unreliable.'" PCRA Ct. Op. at 14, *citing Williams*, 732 A.2d at 1180 (internal citation omitted). In fact, we have remarked that "[t]here is no less reliable form of proof, especially where it involves and admission of perjury."

---

[11] This rule aligns with those imposed by other states, and is consistent with "a noticeable trend in the decisions in some jurisdictions which have applied the strict rule against [corroborative or] cumulative evidence to place a greater, if not complete, reliance upon the principle that the controlling factor is the probable result or effect of the new evidence upon another trial." T.C.W., *Newly Discovered Evidence, Corroborating Testimony Given Only By a Party or Other Interested Witness, as Ground for New Trial*, 158 A.L.R. 1253 (2011).

13

*Commonwealth v. Mosteller,* 284 A.2d 786, 788 (Pa. 1971) (citations omitted). For that reason, we have emphasized that, when addressing an after-discovered evidence claim premised on recantation testimony, "the PCRA court must in the first instance, assess the credibility and significance of the recantation light of the evidence as a whole." *Commonwealth v. D'Amato,* 856 A.2d 806, 825 (Pa. 2004). "Unless the [PCRA] court is satisfied that the recantation is true, it should deny a new trial." *Commonwealth v. Henry,* 706 A.2d 313, 321 (Pa. 1997) (citations omitted).

With these well-established principles in mind, we find it necessary to answer two preliminary questions central to the after-discovered evidence analysis in this case. First, do Tyson's affidavit and new testimony amount to a recantation? And if so, then second, did the PCRA court believe that recantation to be true?

The answer to the first question is clear. Although Tyson's new statements did not directly conflict with her trial testimony- neither party asked Tyson at trial if she ever discussed the murder with Espada – it is undoubtedly a recantation of her March 15, 2011 statement to police. In that statement, which the Commonwealth introduced at the evidentiary hearing. Tyson stated: "I spoke to Pedro [Espada] but didn't talk about [the murder]." N.T. 5/12/15, 63. She directly contradicted this statement in her 2015 affidavit and testimony by asserting that when she spoke with Espada just hours after the murder, he confessed to her he committed the crime. Moreover, in her 2015 affidavit,

14

Tyson acknowledged she "withheld certain personal knowledge from the Harrisburg Police Department when questioned. . . [and] continued to withhold that personal knowledge while testifying at defendant's jury trial." Affidavit of Fact, R.R. 270(a).

*Commonwealth v. Price,* pgs. 26-27

Before we go to much farther in the weighing and comparing Tyson's statements and testimony, the Court wishes to retract, or restate, a sentence which has haunted this author for some time. In our earlier PCRA opinion, we stated "In light of the circumstantial evidence at trial, and not a shred of forensic evidence to support Defendant as the shooter, a different outcome is probable. " Today we wish to restate that position as " In light of the circumstantial evidence at trial and not a shred of <u>direct</u> forensic evidence to support Defendant as the shooter, such as gun powder residue, fingerprints or the like, a different outcome, based on a jury's weighing of the totality of the case, could lead to a contrary result. We acknowledge, as previously stated herein, that this is not the standard of review. The jury would have to discount the testimony of Dr. Wayne Ross.

Dr. Wayne Ross, a Forensic Pathologist, testified the cause of Price's death was a gunshot wound to the head and the manner of death was homicide. N.T. 8/7/12, 28-29. Dr. Ross explained the fatal bullet entered "the left side of [Price's] face just next to the left eye" and exited the right side of this head. *Id.* at 21-22. Importantly, he described finding soot around the wound, which indicated it was a "contact gunshot wound," meaning the "barrel [of the gun] was jammed up or pressed into the face." *Id.* at 22. According to Dr. Ross's expert

15

opinion, the gun that killed Price had to be pressed into the left side of his fact in order to leave the soot and barrel impression examined. *Id.* at 26-27.

Furthermore, there is testimony from multiple eyewitnesses that Defendant had his right arm around Price and was walking on Price's left side immediately before the shooting. The forensic testimony, in assessing all defense proffered testimony is the Commonwealth's catalyst to refuting same. The version that Espada gave Deleon could not have physically happened. He said he was three feet away, three to five feet away. The forensic facts establish that whomever killed Will Price was not three to five feet or any appreciable distance away. The parties stipulated that the gun used in the shooting was a 25-caliber firearm, a Mauser semiautomatic pistol. [N.T., Vol. 4, 8-9-12, p. 36].

Importantly, Lisa Small, Defendant's sister testified, "At the time of the shooting, Will and Eric are alone on the corner. The Uptown Boys chase my brother towards the river. Pedro is behind the crowd, walking behind the crowd in between them and Will and Eric." That was the initial statement in the recording. The written statement signed by her, on a direct question put to her: "At the time of the shooting, was anyone else standing near Eric and Will?" He answer was: "At the time, no."

This testimony is extremely important when assessing the newly acquired testimony of Tyson. Lisa Small's statements closer in time to the shooting and her station as the defendant's sister, give them a strong and heavy weight.

Then, adding thereto the defendant's own statement given to the police that he was at the time the shot was fired, was the closest of anyone to Price, and the shot came at some

16

distance. Clearly, if the forensic findings mean anything, the shot was not at distance. However, the defendant himself places himself as the only one capable to impress a handgun against the deceased to create the forensic findings leaving the barrel mark and residue of the killing.

We turn now to inspect Ms. Tyson's recent testimony. At the PCRA evidentiary hearing on May 12, 2015, Tyson testified that, within twenty-four hours of the murder, Espada called her and stated he was coming to her apartment. N.T. 5/12/15, 56. When Espada arrived, Tyson noticed he "was looking a hot mess.... He cut his hair and he just looked like he was up all night crying and stuff and he was like shaken up." *Id.* She asked him what was wrong. *Id.* After stating he had "messed up[,]" Espada proceeded to tell Tyson he killed Price. *Id.* at 56-57. He told her he did it because of Price's prior assault on Tyson, *Id.* at 57-58. He also stated everybody was "in his ear the whole night talking about he should get him." *Id.* at 57.

According to Tyson, she did not tell police about Espada's confession when they interview her after the murder because her "two oldest kids were in foster care and [she] was getting a lot of threats on Facebook." *Id.* at 59. She claimed: "[T]he police were threatening me that they would make sure my kids would stay in foster care and when I would have the baby I was pregnant with, they would take here and lock me up and make sure I lose my apartment, and stuff like that. *Id.* As for her sudden willingness to come forward, Tyson explained she had "been praying a lot" and wanted to remove the stress she bore from withholding this information. *Id.* at 60.

On cross-examination, the prosecutor challenged Tyson with the signed statement she gave to police on March 15, 2011. In that statement, she Detective Heffner she spoke with

17

Espada at some point after Price was killed, but denied they talked about the murder. *Id*. at 63. Although Tyson admitted to signing the March 2011 statement, she clamed at the evidentiary hearing that she did so without reading it; she also claimed the detective "wrote it very different from what [she] said." *Id*. at 63-64. When asked why she failed to report the threats made against her, she stated she did let police know about them, but asserted the "police were some of the people that were threatening [her]" and they told her there was nothing they could do. *Id*. at 65, 68.

We note Tyson's testimony regarding when she spoke to Espada was internally inconsistent. While she unequivocally stated in her affidavit that she saw Espada "[w]ithin hours of murder," R.R. at 270(a), and she testified to that effect when promoted by defense counsel at the evidentiary hearing, her testimony seemingly differed on cross-examination. Notably, when the prosecutor asked Tyson if she had cut Espada's hair, she responded: "I didn't give hm a haircut. When he came to my house that day he told me he shot [Price], that was like a week later when his hair was already cut." N.T. 5/12/15, 67

Although we see Tyson as someone with a different station than that of the other "jailhouse snitches" with something to gain and that is to be afforded much consideration, the ultimate quality of the substance of what that testimony actually adds to the controversy is equally a part of the equation. Her relationship with Espada admittedly gives her a comparatively higher quality. This "high grade" has many variables to consider. Some of positive numerical value, but herein, some of undeniable negative value.

18

The Supreme Court stressed that "the PCRA court, as fact-finder, "is in a superior position to make the initial assessment of the importance of [the recantation] testimony to the outcome of the case," and remanded with a direction for the PCRA court to "render its own, independent findings of fact and conclusions of law concerning [the recanting person's] credibility and the impact, if any, upon the truth-determining process which can be discerned from such testimony." 732 A.2d at 1181.

Footnote 13 of Pennsylvania Supreme Court Opinion herein reads:

We recognize that, in cases such as *Williams* and *D'Amato,* we specifically remanded to the lower court could make credibility determinations on the recantation testimony "with an eye to the relevant prejudice standard," *Commonwealth v. Johnson,* 966 A.2d 523, 541 (Pa. 2009), *i.e.,* with any eye to the fourth prong of the after-discovered evidence test. Nevertheless, we find such credibility determinations to be equally important to the recantation evidence that may be of a different grade or character that evidence presented at trial. If the court determines the recantation testimony is incredible or untrue, it necessarily cannot be of such a higher and different grade or character as to remove it from the category of "merely corroborative or cumulative" evidence.

. . . We recognized learned Pennsylvania jurists have similarly criticized the rote recitation and application of the four-pronged after-discovered evidence test as tending to supplant the critical inquiry in determining if a new trial is warranted

19

– *i.e.*, whether the new evidence is of such probative value that it would have likely changed the outcome of the trial if it had been introduced. *See, e.g. Commonwealth v. Perrin*, 59 A.3d 663, 669 (Pa. Super. 2013), *vacated* 103 A.3d 1224 (Pa. 2014) (Wecht, J., concurring) ("In practice, the third and fourth prescribed inquires tend to collapse into each other. The fourth question, regarding the likelihood of a different result, tends to dominate the entire inquiry. I will go one step further and suggest that the second factor, concerning whether the after-discovered evidence in question would be merely cumulative, similarly is subsumed by the question of prejudice."); *Commonwealth v. Choice*, 830 A.2d 1005, 1010 (Pa. Super. 2003) (Klein, J., dissenting) ("I believe that what we have called a four-prong test is really only a three[-] prong [ ] test. Prong # 3, the 'only for impeachment' prong, is just an extension of Prong # 4, that the new evidence would not affect the outcome. Normally, evidence that just would tend to impeach what a witness said would not change the outcome at a new trial.") The definition of "merely corroborative or cumulative" evidence we announce today favorably advances the inquiry into whether the evidence would likely result in a different verdict, which we view as the lodestar of the after-discovered evidence analysis.

We also took the opportunity to review Commonwealth's closing arguments to refresh our view of their theory of the case and the impact of Tyson's new testimony. Prosecutor's initial overview of the case was stated as, "An opportunity arose outside of Egypt Club. Eric Small ambushed Will Price walking out, gripped him up, slow-walked him to 2nd and State

20

Street, cupping a 25 caliber, pressed it against his head, killed him, and fled with his buddy Pedro to their respective homes. That, to me, is the most logical inferences to draw from this evidence. And I will explain in a little more detail how I have reached that conclusion in a second." [Commonwealth's Closing Argument August 9, 2012, pg 3 li 2-9]

The prosecutor went on to stress the four key eyewitnesses, one being defendant's sister, as the basis to weigh this case. He acknowledged that the witnesses who were called testifying as to defendant's confessions were of lesser value. Clearly the forensic nature of the close proximately gunshot wound to the relative physical positions of all the actors at the time of the shot fired is critical. Pedro Espada's role and location were also addressed.

"I want to hit just head-on this idea of Pedro as the shooter. That's obviously the defense. And the evidence suggests to me, and I suggest to you, it is clear Pedro had some involvement in what occurred here. That seems obvious to me based on the evidence. To what extent, who knows.

I think these are all logical inferences to draw from what you heard: Did he know it was going to happen? Maybe. Did he know he made the statement the girls stay inside, something is going to go down? It seems to me that he knew. Did he encourage it? Maybe. Did he order it? Maybe.

What we do know from the testimony is that the two of them fled together. There are two footprints, and all the witnesses indicate both men are running towards the riverfront. So was he involved, absolutely. But there is nothing based on the evidence to suggest that he was

21

the shooter. In fact, to conclude that, you would have to disregard virtually every piece of testimony that you heard.

Now they want you to hang their hat on - - and I am going to use the air quotes - - the confession to Deleon Dotson. That's really it."

[Commonwealth's Closing Argument August 9, 2012, pg 6 lis 3-24]

As instructive to the lower courts, the Supreme Court herein cited at length and factual reviewed three cases as illustrative of the types of newly acquired testimony that warrants the granting of a new trial.

See *Commonwealth v. Cooney*, 282 A.2d 29 (Pa. 1971), *Commonwealth v. Valderrama*, 388 A.2d 1042 (Pa. 1978), *Commonwealth v. Bulted*, 279 A.2d 158 (Pa. 1971).

In *Bulted,* the Commonwealth had made comments during closing to give little weight to defense proffer of a "mystery man" having a purported affair with the deceased in this murder trial of husband defendant. The Commonwealth opined in closing that it was all made up. The later found man who admitted his affair might not affect the outcome of guilt, but the degree of homicide was being weighed as well. Herein we have no degree of homicide issue affected by the proffered testimony. The other cases refer to a higher character, higher degree, higher impact on the weighing of the overall trial.

These cases point to the required significant and discernable weight that comes and adds to the weighing of the facts. The kind that by its very self-weight impacts the action on

22

the fulcrum of the balance of the pans of justice. In another vernacular, is the testimony, in contrast to the evidence adduced at trial as a whole, a game changer?

Herein, there remains, by this Court's assessment, facts beyond change. And the forensic evidence shines brightest. Although Tyson's station is of higher position, her substance is severely weakened by her prior statements and recantation. One need not go as far as to find her recollection as totally false to relegate this testimony of minor impact. Espata was unquestionably involved in this murder. His knowledge leading up to the shooting and the very motive for the execution of Price are established. The question becomes not just was he the shooter, but he can be emotionally a "hot mess" because he was, in fact, a major player in the death of William Price.

The deductive objective reasoning of the facts testified and forensic circumstantial evidence all lead to the inescapable conclusion of the defendant's guilt. As the Commonwealth stated in their closing remarks, and even with the addition of Tyson's newly proffered testimony would not require them to change, is that "this case comes down to two things: the science and positioning. And if you take an objective, calculated look at our evidence and you see how every key witness to this murder is corroborated, it leaves you with one conclusion and exactly what I promised you: that our evidence, the eyewitness testimony combined with the science, excludes the physical possibility of everyone else except him. Think about that.

Everyone who saw this puts the two of them standing alone. There is only one person, based on the evidence that you have. And, again I'm asking you to set aside all the speculation and guesswork and stupid chatter, and leave you with those two pillars of this case: the science

23

and the positioning. There's only one person that on this evidence could have committed this murder; that is this defendant. We ask you to find him guilty of murder in the first degree because it is wholly supported by the evidence."

Commonwealth's Closing Argument, August 8, 2012, pg. 19 li 17 to 20 li 8.

We find no higher degree in Tyson's testimony nor would it, under the facts herein, lead to a result other than originally found by the jury.

ORDER

Accordingly, we hereby dismiss Defendant's PCRA petition.

BY THE COURT:

_____
Scott Arthur Evans

Dated: June 30, 2020

Distribution: 7/2/20 C 1201pm

District Attorney's Office
Kaitlyn Clarkson, Esq. maile

24